Emanuel Grossman, Appellant v. Public Water Supply District No. One of Clay County, a Public Corporation, E. E. Davidson and Sally C. Hall.—96 S. W. (2d) 701.

Court en Banc, August 22, 1936.

*Jules E. Kohn* for appellant.

*Jerome Walsh, Charles & Trauernicht, Seward McKittrick* and *L. E. Bates* for respondents.

ELLISON, C. J.—The plaintiff appeals from a judgment of the Clay County Circuit Court dismissing his bill for an injunction after a demurrer thereto had been sustained and he had declined to plead further. Owing to the public importance of the questions involved and the necessity for an early decision thereof, the appeal has been advanced on our docket and the parties have waived oral argument and submitted the cause on briefs. The respondent is a public water supply district organized under Laws 1935, page 327, and proposes to issue certain bonds as authorized thereby. The appellant, a landowner in the district, seeks to enjoin the issuance of the bonds on the grounds: that the act is unconstitutional in several particulars; that the resolution of the board of directors providing for the issuance of the bonds violates the Constitution; and that said resolution is invalid because it conflicts with the act.

The act is long and we shall not attempt to state its provisions here, but will review them as necessary in the course of the opinion. Suffice it to say it provides for the organization and incorporation of Public Water Supply Districts in counties now or hereafter having a population of 25,000 inhabitants or more, by proceedings in the circuit court (much like the proceedings for the organization of drainage and sewer districts) for the purpose of furnishing to the public pure and wholesome water for all needful purposes from common sources of supply.

I. The first assignment in the appellant's brief is that the act violates Section 28, Article IV of the Constitution of Missouri because it contains more than one subject, and the subject matter thereof is not clearly expressed in the title. The title is as follows: "An Act to provide for the incorporation, organization and management of public corporations in counties which now have, or may hereafter have, a population of twenty-five thousand inhabitants or more to be known as public water supply districts; for the acquisition or construction by said districts of waterworks for public and private use; for the enlargement, improvement, and maintenance of said works; for the acquisition of all property necessary therefor; for the raising of funds to carry into effect purposes of this act; for providing for fire hydrants; and for distribution of water by said districts."

The parts of the act which it is claimed are not germane to the general subject of the legislation and which range outside the field foreshown by the title, are as follows: Section 3 provides public water supply districts may include contiguous territory in one or more counties, and may take in school districts, or parts thereof, and cities that do not have a waterworks system. Sections 4 and 6, taken together, require the decree of incorporation to divide the district into five subdistricts and provide that one member of the board of directors shall be chosen from each subdistrict.

Appellant's contention that these provisions make the act double and that they are smuggled in under a masked title is wholly untenable. Discussion is not needed to show that a provision specifying what territory may be included in such districts not only has a natural relation to the legislative project, but is necessary to its accomplishment, or at least to the clarity of the law. The same is true of the provision fixing the number of directors and the parts of the district from which they shall come. And while the title of the act does not specifically cover these details, that could hardly have been done without making the title as long as the act itself if the same course were followed throughout. The title does announce the act provides for the incorporation, organization and management of public water supply districts in counties now or hereafter having at least 25,000 population, and that is sufficient to comprehend the provisions here brought into question. [State ex rel. Webster Groves Sanitary Sewer District v. Smith, 337 Mo. 855, 867, 87 S. W. (2d) 147, 151; State Square Auto Supply Co. v. Gerk, 325 Mo. 968, 981, 30 S. W. (2d) 447, 453; State v. Mullinix, 301 Mo. 385, 390, 257 S. W. 121, 123.]

II. Preliminary to stating appellant's next assignment of error, we must sketch further provisions of the act. Sections 5 and 13 thereof authorize public water supply districts to contract indebtedness for certain purposes and to issue general or special obligation bonds, or both, therefor. In this instance the respondent district

proposes to issue $205,000 in general obligation bonds and a like amount of special obligation bonds.

Special obligation bonds, as defined by Sections 13 of the act, are "bonds payable, both as to principal and interest, wholly and only out of the net income and revenues arising from the operation of the waterworks system of any such district, after providing for costs of operation, maintenance, depreciation and necessary extensions and enlargements." The section further requires that "before or at the time of issuing any such special obligation bonds, the board of directors shall pledge such net income and revenues to the payment of such bonds, both principal and interest, and shall covenant to fix, maintain and collect rates for water and water service supplied by such district so as to assure that such net income and revenues will be sufficient for the purposes herein required."

Section 11 of the act provides that: "the rates or charges to be so fixed shall, at all times, be reasonable, but in determining the reasonableness of rates or charges, the board shall take into consideration the sum or sums required to retire outstanding special obligation bonded indebtedness of the district and the interest accruing thereon, the need for extensions of mains, repairs, depreciation, enlargement of plant, adequate service, obsolescence, overhead charges, operating expenses, and the need of an operating fund out of which the district may protect itself in emergencies and out of which the incidental expenses of the district may readily be met."

Note that the effect of these provisions is to require the establishment and collection of rates for water service which shall be adequate to meet not only the district's indebtedness on its special obligation bonds, but also operating expenses and outlays for maintenance, depreciation, necessary extensions and enlargements; and the income and revenue arising from the operation of the waterworks system are allocated first to the payment of the latter. In other words Section 13 says the bonds are payable only out of *net* income and revenue *after* these other expenses and outlays have been met.

Appellant's contention in his second assignment of error is that the resolution of the board of directors authorizing the issuance of the special obligation bonds is invalid because it conflicts with the foregoing provisions of the statute in that Section 16 of the resolution *limits* the amount of funds which may be set aside for depreciation, extensions and enlargements to five per cent of the monthly operating revenues; and Section 20 requires funds sufficient to pay the bonds always to be set aside; whereas the statute subordinates the bonds to expenses for operation, maintenance, depreciation, extensions and enlargements, and primarily pledges the entire revenues from operation to the latter.

To understand these contentions it will be necessary to refer to several sections of the resolution. Section 15 thereof requires that

"the entire revenues derived from the operation of the water supply system of said District shall be set aside in a separate and special fund designated the 'Water Revenue Fund,' which shall be used only in paying the cost of operation, maintenance, depreciation and the necessary extensions and enlargements of said water supply system, and for the payment of the principal of and the interest on said Special Obligation Bonds of said District which are made payable by their terms only from such revenues."

Then Section 16, relied on by respondent, establishes three separate accounts in the aforesaid Water Revenue Fund, to be designated severally, "Operation and Maintenance Account," "Depreciation, Extension and Enlargement Account" (which, for convenience we shall hereafter call the "Depreciation Account"), and "Bond Account;" and provides that into these three accounts shall be paid on the first business day of each month all monies held in the Water Revenue Fund, in the following order: "(a) Into the Operation and Maintenance Account an amount sufficient to defray the reasonable expense of operating and maintaining the said water supply system for a period of one month; (b) into the Depreciation Account *a sum not exceeding five per centum (5%) of the amount of revenues received during the preceding month,* which shall be held and used for a depreciation reserve and for the making of necessary extensions and enlargements to said system; (c) into the Bond Account an amount not less than one-sixth of the amount of interest becoming due on said Special Obligation Bonds on the next succeeding interest payment date, plus an amount at least equal to one-twelfth of the principal of said bonds due on the next preceding bond maturity date." This subsection c is designed to take care of the semi-annual interest and the bonds maturing annually.

Section 17 provides that until the money in the Bond Account equals the aggregate interest and principal requirements of the bonds for the next year, there shall also be paid on the first business day of each month from the Water Revenue Fund into the Bond Account an additional twenty per cent above the amount required by subsection c of Section 16 to create a reserve for contingencies in the payment of the principal and interest of the bonds.

Section 18 says *that any surplus in the Operation and Maintenance Account may be transferred either to the Bond Account or to the Depreciation Account,* as the board of directors may direct; and any monies in the Depreciation Account in excess of the amount necessary for the purposes above set out during the next year, as determined by the board of directors, may be transferred from said Depreciation Account to the Bond Account.

Section 19 of the resolution provides that if at the beginning of any month the amount in the Water Revenue Fund is insufficient to provided for all of the required payments into the Bond Account, the

amount of such deficiency shall be included in the sum requisitioned for the next month. But that whenever the amount in the bond account equals the whole amount of principal and interest on the special obligation bonds then remaining outstanding, no further payments shall be made into the Bond Account.

Section 20, cited and relied on by respondent, requires that the funds set aside and credited to the Bond Account in accordance with the resolution shall in no event be less than the amount necessary to pay the principal and interest of the bonds as they accrue.

By Section 23 of the resolution the district pledges itself and covenants with the holders of its authorized issue of bonds, both general and special, that it will fix, maintain and collect rates for water and water service so as to assure that the net income and revenue of the water supply system of the district will be sufficient for the purposes declared in the resolution. Section 25 of the resolution, as we read it, provides that while any of the issue of special obligation bonds authorized thereby remain outstanding and unpaid, no additional special obligation bonds shall be issued unless the revenues on hand from the water system are sufficient to take care of all costs of operation, maintenance, depreciation, extensions and enlargements for the next year, leaving a balance of 120 per cent of the principal and interest requirements for the next year on the outstanding special obligation bonds of the present proposed issue, and 120 per cent of the principal and interest requirements for the next year on the new issue, treating an equal portion of the whole new issue as coming due each year of the period until all are matured.

Section 26 of the resolution covenants and agrees with the holders of the special obligation bonds that the district will punctually perform all duties with reference to the water supply system required by the Constitution and laws of the State, including the fixing, maintaining and collection of rates for water and water service, *and the segregation of the revenues from the water system and the application of the respective funds created by the resolution.*

By the foregoing provisions, it will be seen, the entire operating revenues each month must be paid into the three accounts set up for the Water Revenue Fund. The Operation and Maintenance Account comes first. The amount going into it is not fixed, but is required to be a sum sufficient to defray operating expenses for the month. The amount put into the Bond Account likewise is not fixed but is required to be *not less* than one-sixth of the interest due on the bonds at the next interest pay day plus an amount *at least* equal to one-twelfth of the principal of the bonds due on the next maturity date, with an additional twenty per cent to be added in certain contingencies. But the amount to be paid into the Depreciation Account is fixed by subsection b of Section 16 at a sum *not exceeding* five per cent of the revenue from operations during the preceding month.

Under Section 25 no further funds can be made available for depreciation, extensions and enlargements by means of a new issue of special obligation bonds unless there be in the Bond Account a balance of 120 per cent of the principal and interest requirements on the outstanding bonds and the new bond issue for the next year; and by Section 26 of the resolution the district *covenants* with the bondholders that the revenues from the water system will be segregated and the three funds applied as provided above in the resolution.

If the case stood on these provisions of the resolution alone we should feel constrained to hold the bond issue failed to comply with the law. Section 13 of the act explicitly says the special obligation bonds shall be paid only out of the *net* income and revenues from the operation of the waterworks system *after* providing for costs of operation, maintenance, depreciation and necessary extensions and enlargements. A legislative intent is plainly disclosed that the system shall be properly operated and maintained and that necessary extensions and enlargements shall be made. These demands cannot be ignored and the system starved to pay the bondholders. Section 11 of the act requires the rates or charges for water and water service to be fixed and maintained with a view to the need for extensions of mains, repairs, depreciation, enlargement of plant, adequate service, obsolescence, overhead charges, operating expenses, and a proper operating fund for emergencies and incidental expenses.

The respondent argues these latter are all matters resting in the discretion of the board of directors of the district and that when by subsection b of Section 16 of the resolution they fixed the amount of the Depreciation Fund at a sum not exceeding five per cent of the revenue derived from the operation of the water supply system, they exercised that discretion and the same is not now open to judicial review, citing Selecman v. Matthews, 321 Mo. 1047, 1051, 15 S. W. (2d) 788, 789.

It is true a discretion is by the statute lodged in the board of directors of public water supply districts in relation to the above matters; but that discretion is to be exercised from time to time as conditions arise calling it into exercise. It is not a mere matter of setting up a reserve for depreciation. The amount needed for extensions and enlargements cannot be determined twenty years in advance (which is the life of the latest maturing special obligation bonds involved in this case). And the board of directors cannot contract away its power to exercise its discretion in the proper manner and at the proper time, 46 Corpus Juris, section 296, page 1034. On an analogous question see City of Moberly v. Hogan, 317 Mo. 1225, 1230, 298 S. W. 237, 239.

But there are other sections of the resolution which we think save the bonds from invalidity. Section 18 says any surplus in the Operation and Maintenance Account may be transferred to the De-

preciation Account as the board of directors may direct. Section 23 pledges the district to fix, maintain and collect adequate rates so as to assure an income sufficient for the purposes declared in the resolution. And Section 26 covenants that the district will punctually perform all duties with reference to the water supply system required by the Constitution and laws of the State. Construing all the sections of the resolution together it must be concluded subsection c of Section 16 provides only for the routine level and method of maintaining the Depreciation Account, and that through the maintenance of adequate rates sufficient money will be put in the Depreciation Account to meet the needs thereof, either directly or by transfer from the Operation and Maintenance Account.

We are fortified in this view by the fact that Section 15 of the resolution requires the *entire* revenue from the operation of the water supply system to go into the Water Revenue Fund and thence into the three accounts specified. The Operation and Maintenance Account has first claim on the funds and must get an amount sufficient to defray reasonable expenses for operation and maintenance during the month. Next the Depreciation Account is to receive not exceeding five per cent of the preceding month's revenues. Then there is allocated to the Bond Account an amount not less than the preceding month's share of the principal and interest requirements for the current year. Section 17 calls for an additional twenty per cent to create a reserve for contingencies until the money on hand reaches a certain level. But there is no residuary clause. Nothing is said about what shall be done if the monthly revenues overrun the aggregate requisitioned by Section 16 for the three accounts. We must construe the resolution as valid and conforming to law, if we can, and we think the construction we have given it above, permissible.

Closely akin to the assignment just discussed is the one made by appellant based on Section 20 of the resolution. As will be recalled that section says that in no event shall the funds set aside and credited to the Bond Account be less than the amount necessary to pay the principal and interest of the bonds as they accrue. Appellant asserts this provision likewise conflicts with the terms of the act which make the special obligation bonds payable only out of net revenues after operating, depreciation and betterment expenses are paid. But Sections 23 and 25 of the resolution also covenant that rates will be fixed, maintained and collected sufficient to meet the bonds and interest, and we think the provisions of Section 20 are to be construed therewith, and to be taken to mean that the required amount must be credited to the Bond Account each month, if available.

That the resolution does not contemplate the Bond Account must be credited with the amount necessary to meet the bond requirements *in any event,* is shown by the provisions of Section 16 thereof, which make the Operation and Maintenance Account come first in the order

of payment; the Depreciation Account second, and the Bond Account *third*. Also, Section 19 says that if at the beginning of any month the amount in the Water Revenue Fund is *insufficient* to provide for all required payments into the Bond Account, the amount of such deficiency shall be included in the requisition for the next month. So we rule this assignment also against the appellant.

III. The last assignment is that the issuance of the general and special obligation bonds provided for in the resolution would violate Section 12, Article X of the Constitution of Missouri which limits the indebtedness of the respondent and other like political corporations to an amount not exceeding five per cent on the value of the taxable property therein, as ascertained by the assessment next before the last assessment for State and county purposes. The applicable assessed valuation of property in the district is $4,191,234. The $205,000 of general obligation bonds admittedly would be an indebtedness of the district within the meaning of the Constitution, but they alone would be within the five per cent limitation. If the $205,000 of special obligation bonds also would be a debt in the constitutional sense the whole would amount to $410,000, far exceeding the limit set by Section 12, Article X. But Section 13 of the statute says these special obligation bonds "shall not be deemed to be indebtedness of any such district within the meaning of any constitutional or statutory limitation upon the incurring of indebtedness." Appellant maintains, however, that they must be so regarded, the statute to the contrary notwithstanding, because the net revenues of the *whole* waterworks system, including the part financed by the general obligation bonds, are pledged to their payment. In other words the contention is that where a political corporation, as here, provides by taxation a fund or property the income from which is contractually devoted to the payment of so-called "special obligation" bonds, it is an indirect and evasive way of paying the latter by taxation, and the bonds are a debt under the above section of the Constitution.

It has been held repeatedly in this State that the constitutional limitation imposed by Section 12, Article X of the Missouri Constitution on the indebtedness a political corporation may incur, contemplates a debt which must be paid directly or indirectly by resort to taxation. [State ex rel. Smith v. City of Neosho, 203 Mo. 40, 82, 101 S. W. 99, 109; Bell v. City of Fayette, 325 Mo. 75, 91, 28 S. W. (2d) 356, 361; Hight v. City of Harrisonville, 328 Mo. 549, 558, 41 S. W. (2d) 155, 158; Hagler v. City of Salem, 333 Mo. 330, 336, 62 S. W. (2d) 751, 754; State ex rel. City of Hannibal v. Smith, 335 Mo. 825, 833, 74 S. W. (2d) 367, 371; Sager v. City of Stanberry, 336 Mo. 213, 227, 78 S. W. (2d) 431, 438.]

It is likewise well established that the "special fund doctrine" prevails in Missouri, and that an indebtedness of a city or other like political corporation payable only out of income derived from the

property purchased is not a debt within the meaning of the above provision of the Constitution. [State ex rel. Excelsior Springs v. Smith, 336 Mo. 1104, 1112, 82 S. W. (2d) 37, 40; State ex rel. City of Hannibal v. Smith, 335 Mo. l. c. 834, 74 S. W. (2d) l. c. 371.] But if the special fund pledged to the payment of the debt must be replenished by taxation the contrary is true. [Hagler v. City of Salem, supra; Hight v. City of Harrisonville, supra.]

The exact question presented by counsel in this case is one which has not been decided before in Missouri except as it has been touched on by two cases to which we shall presently refer. The decisions here and elsewhere will be found to fall in two classes. One group consists of cases where the municipality or other political corporation already owned a public utility or similar property with an established income, and sought to improve or enlarge it by issuing so-called "special obligation" bonds or "revenue" bonds or "pledge orders" payable only out of the income from the whole property as improved or enlarged, thus including the revenues theretofore received from the original property instead of segregating the earnings of the added new part and making them alone pay its cost. The other group of cases are those in which the political corporation built or purchased a utility, having had none before, and as in this case, paid for it in part by general obligation bonds payable by taxation, and in part by special obligation bonds to the payment of which the revenues of the whole property were pledged.

Of this latter class is State ex rel. Smith v. City of Neosho, 203 Mo. 40, 82, 101 S. W. 99, 109, decided by this court en banc in 1907, where the defendant city purchased a water plant and paid for it by issuing $25,000 in general obligation bonds and agreeing to pay $21,000 in deferred payments solely out of the earnings of the plant. The arrangement was held valid by this court en banc on the theory that it involved no resort to taxation, and that the underlying purpose of Section 12, Article X of the Constitution is to serve as a protection to taxpayers. On its facts this case favors the contention of the respondent district.

Bell v. City of Fayette, 325 Mo. 75, 28 S. W. (2d) 356, decided by the court en banc in 1930, falls in the other class. There the city of Fayette owned an electric plant, and added certain engines and other equipment, to be paid for only out of the savings in the earnings of the plant as a result of the use of the new equipment. The contract was held valid, and this court en banc cited the Neosho decision, supra, as authority for its conclusion. But there was another point in the case. The appellant attempted to distinguish the Neosho case by saying that there the city was purchasing a plant which it did not own before, and from which it had been receiving no earnings whereas the city of Fayette was pledging the earnings of a plant with an existing income, which it already owned, to pay for the new equip-

ment. Apparently answering this point, the opinion seems to concede (whether merely *arguendo* is not clear) the correctness of a holding in Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874, that where a city seeks to build an extension to its *existing* municipally owned plant solely out of plant earnings, the earnings of the extension must be segregated and they alone must pay the bill; otherwise the obligation will be a debt in the sense of the constitutional limitation, and must be counted as such. But the opinion declares the fact that the city of Fayette agreed to pay for the new equipment only out of the *savings* in earnings effected by it, constituted a segregation of the earnings of that equpiment and brought the case within the Illinois rule. On the whole this Fayette case must be regarded as an authority against the respondent here though it seems to concede its conclusion is against the weight of authority. It was cited and followed in City of Campbell v. Arkansas-Missouri Power Co., 55 Fed. (2d) 560, decided by the United States Circuit Court of Appeals for this Eighth Circuit in 1932.

Several other cases have come before this court during the last five years in which the question of "segregation of earnings" was raised and the Fayette case, the Campbell case and the Rock Island case from Illinois, or some of them, were cited, but the point was not decided. These recent decisions are: Hight v. City of Harrisonville, 328 Mo. 549, 41 S. W. (2d) 155; Hagler v. City of Salem, 333 Mo. 330, 62 S. W. (2d) 751; and Sager v. City of Stanberry, 336 Mo. 213, 78 S. W. (2d) 431.

In State ex rel. City of Hannibal v. Smith, 335 Mo. 825, 74 S. W. (2d) 367, decided in 1934, the court en banc held valid $386,000 in bonds issued by the city of Hannibal for the building of a bridge across the Mississippi River and payable solely from the toll earnings of the bridge, although $140,000 of the further cost thereof was granted by the United States government; $200,000 was provided by the State Highway Commission and $20,000 was furnished by the city out of its own funds. The point was made in the briefs in the case that the bonds were not a debt of the city within the meaning of the Constitution, and numerous authorities were cited on the question here under consideration, but it was not expressly ruled, though the bonds were, as we have stated, held valid.

Such seems to be the state of the law in Missouri. But investigation discloses that the Illinois case of Schnell v. City of Rock Island on which the "segregation of earnings" theory of our Fayette case was based, had been overruled by the plainest implication by the Supreme Court of Illinois in Maffit v. City of Decatur, 322 Ill. 82, 152 N. E. 602, in 1926, four years before it was cited and followed in the Fayette case. In the Decatur case it was held that the defendant city, which owned a waterworks system including a dam across

a river and desired to acquire a reservoir site to be used in connection therewith, might pledge earnings from the whole waterworks system for the rental or use and ultimately the possible acquisition of the reservoir. The statement of facts in the opinion in this case shows the dam was *useless* without the reservoir.

Similarly in Ward v. City of Chicago, 342 Ill. 167, 173 N. E. 810, decided in 1930, the city proposed to issue $12,000,000 in certificates of indebtedness to finance the construction of an extension and enlargement of its waterworks system, the certificates to be payable solely from the revenues derived from the whole system. It was held the certificates did not constitute an indebtedness within the meaning of the constitutional limitation thereagainst, notwithstanding the earnings pledged to the payment of the certificates were not limited to the increased revenues arising from the improvement. This case expressly holds the theory that the earnings of the improved part of the water system should be segregated and made to pay for the improvement, was repudiated in the Decatur case, supra. The opinion refers to the Rock Island case, and says it is clearly distinguishable on its facts. But one cannot read these three Illinois cases and reach any other conclusion than that the segregation doctrine of the Rock Island case is no longer the law of Illinois. This was the view taken by the United States Circuit Court of Appeals for the Seventh Circuit in 1931 in City of Jerseyville v. Connett, 49 Fed. (2d) 246.

Illinois Power and Light Corp. v. City of Centralia, 11 Fed. Supp. 874, decided by the United States District Court for the Eastern District of Illinois in 1935 contains some observations apparently at odds with the Ward and Decatur cases, supra, and more in line with the holding in the older Rock Island case. This decision, however, was based on an Illinois statute requiring certificates of indebtedness to be paid solely out of the revenue of the utility property for the acquisition of which they were issued.

In some recent cases in other jurisdictions the "segregation of earnings" theory has been followed, and the Rock Island case, the Fayette case and the Campbell case cited in some instances. [In re Opinion of the Justices, 226 Ala. 570, 148 So. 111; Fairbanks, Morse & Co. v. City of Wagoner (C. C. A. 10th Cir.), 81 Fed. (2d) 209, 219; Garrett v. Swanton, 216 Cal. 222, 230, 13 Pac. (2d) 725.] But this recent California decision is followed by one still later. In Dept. of Water & Power of Los Angeles v. Vroman, 218 Cal. 206, 22 Pac. (2d) 698, decided in 1933, it was held the department of water and power of the city of Los Angeles could issue nearly $23,000,000 in negotiable notes for constructing extensive additions and enlargements of its municipal water and power system connecting with the Boulder Dam, the notes to be payable only out of the power revenue funds of the department.

From an early day it has been held in the State of Washington that a city may contract for additions to a utility plant owned by it and pay therefor out of the receipts of the whole plant, Winston v. Spokane, 12 Wash. 524, 41 Pac. 888.

Colorado does not recognize the segregation of earnings doctrine. Shields v. Loveland, 74 Colo. 27, 218 Pac. 913, and Searle v. Haxtun, 84 Colo. 494, 271 Pac. 629, both hold a municipal utility plant may be erected or improved, the cost being specially paid only out of the income from the whole plant, without creating an indebtedness in a constitutional sense. The Searle case expressly refused to follow the Rock Island case, supra. In a more recent case, Reimer v. Holyoke, 93 Colo. 571, 27 Pac. (2d) 1032, decided in 1933, the Colorado Supreme Court by a divided vote reached a contrary conclusion but did so only on the special facts of the case without overruling the Loveland and Haxtun cases, supra. One of the special facts mentioned in the Holyoke case was that no ordinance had been passed declaring a *necessity* for making the improvements.

Barnes v. Lehi City, 74 Utah, 321, 279 Pac. 878, held the defendant city could purchase necessary additional power and generating equipment to be paid for only out of the revenues of the whole improved plant. In a later case Fjeldsted v. Ogden City, 83 Utah, 278, 28 Pac. (2d) 144, decided in 1933, a divided court held such special obligation bonds could not be issued to extend an existing plant which had a large established income. The Lehi case was distinguished on the ground that in that case the existing plant was worn out and the improvements needed. There is a strong dissenting opinion.

In Hesse v. City of Watertown, 57 S. D. 325, 232 N. W. 53, decided in 1930, a divided court held special obligation bonds could not be issued for building an addition to an established municipal electric plant in the defendant city, which had an existing income, the revenue of the entire plant being pledged to the payment of the bonds. There are intimations in the opinion that if the established plant had been worthless without the improvements, and if no question of pledging existing income were involved the conclusion reached would have been different.

In Lang v. City of Cavalier, 57 N. D. 75, 228 N. W. 819, 826, decided in 1930, the Supreme Court of North Dakota in approving pledge orders issued by the defendant city to purchase generating equipment for its municipal electric plant, the pledges being payable out of the earnings of the whole plant, expressly refused to follow the segregating of earnings theory, holding the entire plant would be *useless* without the generating equipment.

Other cases from other jurisdictions upholding special obligation bonds or pledges such as are involved in this case and in the Neosho case are City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004; Jones v. City of Corbin, 227 Ky. 674, 13 S. W. (2d) 1013-1014;

Johnston v. City of Stuart (Iowa), 226 N. W. 164; Casto v. Town of Ripley, 114 W. Va. 668, 173 S. E. 886; Seward v. Bowers, 37 N. M. 385, 24 Pac. (2d) 253, decided in 1933. This case strongly upholds the right of political corporations to issue special obligation bonds for the improvement of utility plants, payable exclusively from the net revenues of the whole plant. Four of the five justices of the New Mexico Supreme Court wrote separate concurring opinions in which nearly all the preceding authorities cited herein were considered. The following from the concurring opinion of Mr. Justice BICKLEY is noteworthy: ''The case of repairs and betterments necessary to preserve the plant from destruction or impairment and to enable it to function so as to discharge the purpose of its existence is, in my judgment, different from that of an independent extension.'' [37 N. M. l. c. 402.]

From the foregoing scattering review of the most recent cases, it will be seen the law on the question before us here has been the subject of much controversy in other states. The argument underlying the segregation of earnings doctrine, which forbids the pledging of the *existing* revenue of an established plant as a part of the whole revenue of the improved plant, is that the established income from the original plant is the property of the city (or other political corporation) as much as any other money in its treasury; that it can be put in the general revenue fund and used for general municipal expenses. And if it is diverted from these purposes and pledged to the city's obligation for enlarging the plant it must be replaced by money raised by taxes, thereby making the obligation a general debt. [Garrett v. Swanton, 216 Cal. l. c. 230, 13 Pac. (2d) l. c. 729. See, also, Hight v. City of Harrisonville, 328 Mo. l. c. 559, 41 S. W. (2d) l. c. 159.] On the other hand cases taking the contrary view say that if the city has been abstracting money from the earnings of its utility plant to pay general municipal expenses, it amounts to the plant's being milked to feed the general fund, and that the utility patrons are being made to carry a burden that the taxpayers ought to carry; see dissenting opinion in Hesse v. City of Watertown, 57 S. D. l. c. 353, 232 N. W. l. c. 66, and Fjeldsted v. Ogden City, 83 Utah, l. c. 313, 28 Pac. (2d) l. c. 158.

It is noticeable that a number of the cases stress the fact that the improvement or extension of an existing plant was *necessary;* and that the original plant would have been worthless or inadequate without them. As stated in the above quotation from the New Mexico case, supra, there is good ground for drawing a distinction between an independent extension or enlargement of a municipal utility, and extensions or betterments which are necessary to make the original function as intended. We think that without any doubt in the latter instance the plant should be treated as a unit in paying the bills.

That is as far as we need go in this case. Here it is proposed to build a waterworks system in the respondent district one-half the cost being paid by general obligation bonds, and the other half by the special obligation bonds in controversy. It is obvious that the half of the plant built with the general obligation bonds would be worthless if it were not completed from the proceeds of the special obligation bonds. Both propositions were voted on at the same election. The voters did not expect the revenues from the plant to pay off the general obligation bonds and relieve them from taxation. These bonds were voted with the understanding that taxes would be levied to pay both the principal and interest thereof. The taxes will be due whether the waterworks system earns any money or not. The special obligation bonds were voted as a charge on the revenues of the system. To say that they are an indebtedness in a constitutional sense because they are to be paid from earnings of a water system partly financed by general obligation bonds payable by taxation, is to charge up both bond issues to the taxes which were levied only to pay the one issue.

We therefore conclude that the special obligation bonds are not a debt of the district within the meaning of Section 12, Article X of the Constitution of Missouri and accordingly rule this assignment in favor of the respondent.

This disposes of all the questions raised, and the judgment of the circuit court is affirmed. All concur, except *Frank, J.*, absent.