John E. SCROGGS et al., Appellants,

v.

KANSAS CITY, Missouri, a municipal corporation, et al., Respondents.

No. 58241.

Supreme Court of Missouri,
Division No. 2.

Sept. 24, 1973.

Motion for Rehearing or to Transfer to
Court en Banc Denied Oct. 2, 1973.

James Daleo, John E. Park, John C. Craft, Kansas City, for plaintiffs-appellants.

Robert B. Fizzell, Robert B. Fizzell, Jr., Alvin D. Wilken, Kansas City, for respondent Kansas City Missouri Public Building Authority; Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, of counsel.

Aaron A. Wilson, City Counselor, L. B. Saunders, Associate City Counselor, Edward L. Wurdack, Asst. City Counselor, Kansas City, for respondent, Kansas City, Mo.

Howard F. Sachs, Carl H. Helmstetter, Kansas City, for Downtown, Inc., amicus curiae; Spencer, Fane, Britt & Brown, Kansas City, of counsel.

John H. Kreamer, Myron S. Silverman, Kansas City, for The Chamber of Commerce of Greater Kansas City, amicus curiae; Gage, Tucker, Hodges, Kreamer, Kelly & Varner, Kansas City, of counsel.

DONNELLY, Chief Justice.

This is an action for declaratory judgment to determine the legality of an arrangement entered into by the City of Kansas City and the Kansas City Missouri Public Building Authority, a not-for-profit corporation, for the purpose of financing a

convention center facility to be built in Kansas City.

The City has made arrangements to acquire land located adjacent to and west of the Municipal Auditorium in Kansas City as a site for the construction of the facility.

Ordinance No. 41028 of the City authorizes the City to lease the land to the Authority. Resolution No. 3 of the Board of Directors of the Authority authorizes it to enter into a lease with the City. The term of this "Ground Lease" is thirty years, and the rental for such term is $4,000,000, to be paid at the commencement of the lease. The lease provides that the Authority will use its best efforts to issue its bonds for $25,000,000, the proceeds to be used to pay the lease rental, and to build, furnish, and equip the convention center facility.

Under the terms of a "Lease and Agreement" entered into simultaneously with the "Ground Lease," the Authority as sublessor has leased to the City as sublessee the same tract of land with all improvements thereon. The "Lease and Agreement" is for the same term as the "Ground Lease," less thirty days, and the rental for the full term is $54,931,379.38, payable in semi-annual installments on March 25 and September 25 of each year.

The "Ground Lease" contains a provision that the leased land and the improvements made thereon are to be surrendered by the Authority to the City upon the expiration of the lease.

On February 1, 1972, and May 5, 1972, the City passed three ordinances imposing new and increased license taxes on the business of hotels and motels (3½% of gross rentals) and restaurants (1% of gross receipts from sales of food), and on the sale of cigarettes ($1 per place of sale plus $2.50 per 1,000 cigarettes), and providing for payment of revenue therefrom, together with revenue received by reason of operation of the Convention Center, into a "Convention Center Fund." The "Con-

vention Center Fund" is to be used for payment of the City's obligations under the "Lease and Agreement" with the Authority, and to pay the costs of operation, repair and maintenance of the facility.

Resolution No. 3 of the Board of Directors of the Authority authorizes the Authority to enter into an "Indenture" between the Authority and Commerce Bank of Kansas City as trustee. The "Indenture" relates to the issuance by the Authority of its bonds in the principal amount of $25,000,000. The proceeds received from the sale of such bonds are to be used for payment of the rental obligation incurred in the ground lease and for construction of the facility. The "Indenture" provides, also, that the rentals, revenues and receipts received by the Authority from the City as tenant of the facility are to be used to service and retire the bonded indebtedness.

No provision has been made for approval of the bond issue by vote of the qualified electors of the City.

The trial court entered its judgment declaring such financial arrangements constitutional and valid.

The determinative question presented is whether such "Lease and Agreement" violates Art. VI, § 26(a) of the Constitution of 1945, V.A.M.S.

Art. VI, § 26(a) of the Constitution of 1945 reads as follows:

"No county, city, incorporated town or village, school district or other political corporation or subdivision of the state shall become indebted in an amount exceeding in any year the income and revenue provided for such year plus any unencumbered balances from previous years, except as otherwise provided in this constitution."

Art. VI, § 26(b) of the Constitution of 1945 reads as follows:

"Any county, city, incorporated town or village or other political corporation or

subdivision of the state, by vote of two-thirds of the qualified electors thereof voting thereon, may become indebted in an amount not to exceed five percent of the value of taxable tangible property therein as shown by the last completed assessment for state or county purposes, except that a school district by a vote of two-thirds of the qualified electors voting thereon may become indebted in an amount not 'to exceed ten percent of the value of such taxable tangible property."

Art. VI, § 26(f) of the Constitution of 1945 reads as follows:

"Before incurring any indebtedness every county, city, incorporated town or village, school district, or other political corporation or subdivision of the state shall provide for the collection of an annual tax on all taxable tangible property therein sufficient to pay the interest and principal of the indebtedness as they fall due, and to retire the same within twenty years from the date contracted."

Art. X, § 12 of the Constitution of 1875 (the predecessor of the above provisions) reads as follows:

"No county, city, town, township, school district or other political corporation or subdivision of the State shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the consent of two-thirds of the voters thereof voting on such proposition, at an election to be held for that purpose; nor in cases requiring such assent shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for State and county purposes, previous to the incurring of such indebtedness * * *."

This Court has been asked to determine the effect of Art. X, § 12, supra, on many occasions. A general statement appears in Grossman v. Public Water Supply Dist. No. 1, 339 Mo. 344, 96 S.W.2d 701, 706 (1936). This Court said:

"It has been held repeatedly in this state that the constitutional limitation imposed by section 12, article 10 of the Missouri Constitution on the indebtedness a political corporation may incur, contemplates a debt which must be paid directly or indirectly by resort to taxation. State ex rel. Smith v. City of Neosho, 203 Mo. 40, 82, 101 S. W. 99, 109; Bell v. City of Fayette, 325 Mo. 75, 91, 28 S.W.(2d) 356, 361; Hight v. City of Harrisonville, 328 Mo. 549, 558, 41 S.W.(2d) 155, 158; Hagler v. City of Salem, 333 Mo. 330, 336, 62 S.W.(2d) 751, 754; State ex rel. City of Hannibal v. Smith, 335 Mo. 825, 833, 74 S.W.(2d) 367, 371; Sager v. City of Stanberry, 336 Mo. 213, 227, 78 S.W.(2d) 431, 438.

"It is likewise well established that the 'special fund doctrine' prevails in Missouri, and that an indebtedness of a city or other like political corporation payable only out of income derived from the property purchased is not a debt within the meaning of the above provision of the Constitution. State ex rel. City of Excelsior Springs v. Smith, 336 Mo. 1104, 1112, 82 S.W.(2d) 37, 40; State ex rel. City of Hannibal v. Smith, supra, 335 Mo. 825, loc. cit. 834, 74 S.W.(2d) 367, loc. cit. 371. But if the special fund pledged to the payment of the debt must be replenished by taxation, the contrary is true. Hagler v. City of Salem, supra; Hight v. City of Harrisonville, supra."

In Ebert v. Jackson County, 70 S.W.2d 918 (Mo.1934), the County, on July 18, 1925, had leased a room in Kansas City to be used as a courtroom, for a term of four years, beginning August 1, 1925. The County continued in possession for seventeen months and then vacated the room and refused thereafter to pay rent. The lessor brought suit for the rent. Jackson County defended on the grounds that the lease violated Art. X, Section 12, supra, of

the Constitution of 1875. This Court said at 1.c. 919–920:

"It [the County] contends that said contract created a debt within the meaning of said section, and also contends that the contract is an effort to anticipate the income and revenue of the county for several years following the year the contract became effective. In considering said section of the Constitution in Book v. Earl, 87 Mo. 246, loc. cit. 252, we said: 'The evident purpose of the framers of the constitution and the people who adopted it was to abolish, in the administration of county and municipal government, the credit system and establish the cash system by limiting the amount of tax which might be imposed by a county for county purposes, and limiting the expenditures in any given year to the amount of revenue which such tax would bring into the treasury for that year. Section 12, supra, is clear and explicit on this point. Under this section the county court might anticipate the revenue collected, and to be collected, for any given year, and contract debts for ordinary current expenses, which would be binding on the county to the extent of the revenue provided for that year, but not in excess of it.'

"And in Trask v. Livingston County, 210 Mo. 582, loc. cit. 594, 600, 109 S.W. 656, 659, 37 L.R.A.(N.S.) 1045, we also said:

"'It has been uniformly construed that this provision of the Constitution permits the anticipation of the current revenues to the extent of the year's income in which the debt is contracted or created and prohibits the anticipation of the revenues of any future year. Any other construction would render section 12 of article 10 nugatory; for, if the county court of Livingston County in September, 1889, could anticipate the revenue of 1890, it could also anticipate the revenues of 1891 and 1892, and would leave the power of the county, with reference to indebtedness, what it was before the Constitution of 1875 was adopted. * * *

"'Clearly the county court was not authorized to appropriate revenues, which were to be derived from taxation in the year 1890, when such taxes had never been assessed, levied, or collected. While the county court may in any one year draw warrants, after the revenue has been provided, and the taxes levied within the scope of the levy and income for such year, it is too plain for argument that the Constitution forbids the anticipation of the revenues of any subsequent years. If not, all that has been said in regard to the force and effect of section 12 of article 10 of the Constitution, to the effect that its purpose was to put counties upon a cash system, instead of the old credit plan, has been in vain.'"

* * * * * *

"In the instant case the contract was not executory and contingent. It purports to bind the county to pay plaintiff $4,320 for the use of the room for four years, beginning August 1, 1925, payable $90 on the first day of each month, in advance. These payments were to be paid from the income and revenue of future years as well as from the income and revenue provided for the year the contract became effective. It was an unconditional promise made by the county on July 18, 1925, to pay the rent in advance on the first day of each month for four years. The payment of the rent was not contingent upon the occupancy of the room by the justice or on plaintiff's furnishing it to the county for that purpose.

"The contract was an effort to anticipate the income and revenue of the county for several years following the year the contract became effective. It created a debt within the meaning of said section of the Constitution, and is void."

The City of Kansas City, in this case, by the terms of the "Lease and Agreement": (1) agrees, for the full term of the lease, "to maintain the Convention Center Fund * * *, and to do nothing to materially impair or reduce its sources or to other-

wise materially adversely affect the ability of the city to make the payments from such Fund" (Section 104); (2) agrees that in the event of damage or destruction of the facility the lease shall not terminate and its obligation to pay rentals shall not be reduced or affected in any way (Section 502); (3) agrees that the Authority shall "be entitled to specific performance, and injunctive or other equitable relief for any breach or threatened breach of any of the provisions of this Lease and Agreement" (Section 1403); and (4) agrees that "after the commencement date hereof there shall be no amendment, change, modification, alteration or termination which materially adversely affects the security of the holders of the Bonds" (Section 1405). In our opinion, "[t]his is assuming indebtedness which must be paid in all events." New Liberty Medical & Hosp. Corp. v. E. F. Hutton & Co., 474 S.W.2d 1, 6 (Mo. banc 1971). As in *Ebert,* the contract is "not executory and contingent."

■ Respondents acknowledge the presence of the *Ebert* holding, but would terminate its precedential effect on the date Art. X, § 12, supra, became ineffectual. They assert that since the effective date of the Constitution of 1945 (and particularly the adoption of Art. VI, § 26(f), supra,) the words "become indebted" in Art. VI, § 26(a), supra, contemplate only such indebtedness as would require "that ad valorem taxes be levied on all taxable tangible property situated in the city." Respondents argue from such premise that the taxes proposed in this case are in the nature of "excise" taxes, are not ad valorem taxes, and, therefore, that the "indebtedness" involved here is constitutionally valid. We do not agree. In our opinion, § 26(f) does not dilute the restrictive effect of § 26(a). The effect of § 26(f) is to give additional protection to the people by providing that before incurring *any* indebtedness the city "shall provide for the collection of an annual tax on all taxable tangible property therein sufficient to pay the interest and principal of the indebted-

ness as they fall due, and to retire the same within twenty years from the date contracted."

We consider the *Grossman* case (and cases cited therein) significant. They speak only of "taxation." They do not speak of "ad valorem taxation." We find no provisions in the Constitution of 1945 supporting respondents' premise. In the absence of such language, we are not persuaded the law *was* changed with the adoption of the Constitution of 1945.

We are not persuaded the law *should* be changed. We note the experience in the State of Washington on the questions presented in this case. In Gruen v. State Tax Commission, 35 Wash.2d 1, 211 P.2d 651 (1949), the Supreme Court of Washington had held constitutional a statute providing for a bonus to veterans of World War II by means of sale of bonds payable out of an excise tax on cigarettes.

In State v. Martin, 62 Wash.2d 645, 384 P.2d 833, 842, 843 (1963), the Supreme Court of Washington overruled the Gruen case, and said:

"The Gruen decision was handed down upon the reasoning that, if bonds are payable from a special fund and the special fund is in turn filled or replenished in whole or in part from excise taxes, the promise to levy the excise taxes to keep the fund solvent does not constitute a debt within the meaning of our constitution.

\* \* \* \* \* \*

"That the special fund doctrine is a useful and valid tool of government is apparent when one thinks of all of the institutions and devices of government supported by it. But the true test of its application here is not what comes out of the fund, but what goes into it. If the revenues in it derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge, or the operation of the State Liquor Control Board, or from sales of leases of publicly owned lands, any securities

issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state. Hence, we must take care that the employment of peripheral doctrines do not lead us away from the main point of the case. What is a debt of the State of Washington? Any obligation which must in law be paid from any taxes levied generally is, we think, a debt of the state. It matters little whether the tax be ad valorem or an excise."

The following comments by Magnusson, Lease-Financing by Municipal Corporations as a Way Around Debt Limitations, 25 George Washington Law Review 377, 390–391 (1957), are appropriate:

"It seems apparent that lease-financing is actually borrowing by another name. To contend that the method of payment alters the fact of payment strains ratiocination. Unlike ordinary leases, these leases are in practice non-terminable, nor do the parties ever intend to terminate them. The amounts paid as 'rent' are not the use value of the property, as true rent would be, but equal debt amortization charges on the full cost of the facility financed. Moreover, securities analysts would probably treat these charges not as current expenses, which rent would be, but as repayment of long term debt. Nor are these 'leases' aimed at temporary use, as is the ordinary lease, but at acquisition of title. The only variation between these 'rents' and debt service is in the legal web woven around the transaction.

\* \* \* \* \* \*

"The cases finding a lease prohibited may do so on a variety of grounds, e. g. (1) the lease is not really a lease, but something else, such as a purchase contract, in which case there is an 'evasion' of the constitutional restrictions, or (2) even if it is not a purchase, it is a debt for the full amount particularly if there is a mortgage in the transaction, or (3) it involves a redistribution of governmental functions in an area, or (4) it requires continuing future appropriations which are prohibited, or (5) it is a 'present' indebtedness for the total amount paid. But if we examine the facts of any lease-financing case, these distinctions do not appear to be necessary to bring the facts within constitutional prohibitions. It seems clear that the intent behind debt limitations was to prevent long-term repayment obligations; i. e. borrowing for public improvements and to prevent the obligatory annual need for the resulting taxation to pay for the liability. And yet, by whatever name, this is the very effect of lease-financing."

The financial arrangements in this case represent another attempt to utilize "lease-financing \* \* \* as a way around debt limitations." We do not criticize the attempt but we cannot approve it. The people of Missouri may approve long-term deficit financing in government (absent a vote of electors) by amending the Constitution. This Court has no authority (or inclination) to amend the Constitution by indirection.

We hold the "Lease and Agreement" violates Section 26(a), and is void, because it creates a present indebtedness and obligates the City to impose taxes in succeeding years to satisfy this indebtedness.

The judgment is reversed and the cause remanded with directions to enter a declaratory judgment in accordance with this opinion.

HENLEY, P. J., and FINCH, J., concur.

MORGAN, J., not sitting.