The NORTHERN TRUST COMPANY et al., Plaintiffs-Appellants,

v.

CITY OF INDEPENDENCE, Missouri, et al., Defendants-Respondents,

Chris Barker and Roy Lewis, Intervenors-Appellants.

No. 58936.

Supreme Court of Missouri, En Banc.

July 2, 1975.

Rehearing Denied Sept. 8, 1975.

Paul Van Osdol, Jr., Guy A. Magruder, Jr., Terrell, Van Osdol & Magruder, Kansas City, for plaintiffs-appellants.

Billy S. Sparks, Kansas City, for defendants-respondents; James S. Cottingham, City Counsellor, Independence, Linde, Thomson, Fairchild, Langworthy & Kohn, Kansas City, of counsel.

John E. Park and John C. Craft, Kansas City, for Chris A. Barker and Roy Lewis.

FINCH, Judge.

This is a declaratory judgment action wherein plaintiffs, after purchasing and paying for bonds issued by the City of Independence, sought a declaration that the bonds were invalid and that plaintiffs should recover damages, including the purchase price paid for the bonds. Two taxpayers, owners of property in Independence, were allowed to intervene as representatives of a class. They attacked the validity of the bonds on constitutional grounds. The trial court held the bonds valid and plaintiffs and intervenors appealed. We conclude that we have jurisdiction because construction of § 26, art. VI of the Missouri Constitution, V.A.M.S. is involved.

The pertinent events preceding issuance of the bonds were as follows:

The city council of Independence adopted on August 6, 1973, an ordinance which imposed a one-cent sales tax, effective January 1, 1974, and provided that "all such tax received by the City of Independence shall be placed in the General Funds for payment for Principal of and Interest on general obligation bonds to be issued by the City or for general municipal expenses and uses." That ordinance was subject to voter approval and was submitted at a special election held on October 9, 1973. The voters approved a sales tax ordinance by a majority vote, but at that same election six general obligation bond propositions failed to receive the required two-thirds favorable vote.

The Independence City Council met on October 15, 1973, at which time a bill calling a special election on December 11, 1973, to vote again on the same six bond propositions was introduced and given first reading. The Council minutes then state:

"The time limits were checked, discussed and the necessity for an emergency were considered. Councilmen Lamb and Bonville made a motion the bill be made an emergency for the welfare of the public and to insure sufficient time for election requirements. Upon vote, motion carried."

The bill was then renumbered, given its first and second readings, and passed by the council as an emergency measure at that meeting. Sec. 8 of that ordinance reads as follows:

"SECTION 8. That this Ordinance in the judgment of the Council is deemed to be one of an urgent nature and that its immediate passage is necessary for the preservation of the public peace, health, safety and welfare and should become effective immediately upon the date of its passage to insure that the Jackson County Board of Election Commissioners has sufficient time to accomplish the required advertisements and prepare the absentee ballots as required by law prior to December 11, 1973 General Obligation Bond Election."

The ordinance calling the December 11 election provided for the form of the ballot. The bond propositions were to be presented to the voters in the same language used on the October 9, ballot, viz:

"SHALL THE FOLLOWING BE ADOPTED:

"Proposition to issue general obligation bonds in the amount of [stating the amount] for the purpose of [stating the purpose]."

The "Instructions to Voters" section of the ballot was the same as on the October 9 ballot plus this additional sentence:

"These general obligation bonds will be payable first from the City-wide sales tax approved by the voters on October 9, 1973."

At a meeting on November 5, 1973, the Council adopted an additional ordinance which rearranged the order of the bond propositions on the December 11 ballot. It was read and passed as an emergency measure, containing essentially the same lan-

guage as the October 15 ordinance with reference to the need and reason for passage as an emergency measure.

At the December 11, 1973 special election the propositions for $13,920,000 of street improvement bonds and $500,000 of fire station bonds were approved by more than two-thirds of the votes cast. The other four bond propositions did not receive the required two-thirds majority.

On January 7, 1974, the city council approved a Notice of Bond Sale for the $14,-420,000 of bonds approved by the voters. The notice described the bonds as follows:

> "Said bonds will constitute general obligations of said City, payable both as to principal and interest from ad valorem taxes which may be levied without limitation as to rate or amount upon all taxable tangible property within the territorial limits of said City, provided, however, interest and principal of the said Bonds will first be payable from the proceeds of a City-wide one cent (1¢) sales tax approved by the voters of said City on October 9, 1973."

The notice also stated that the bonds would be sold subject to the legal opinion of the law firm of Linde, Thomson, Van Dyke, Fairchild & Langworthy of Kansas City, Missouri (hereinafter Linde, Thomson).

On January 21, 1974, the council amended the sales tax ordinance so as to change the effective date from January 1 to April 1, 1974. The ordinance provided that sales taxes collected "shall be placed in the General Fund for payment of principal of and interest on General Obligation Bonds to be issued by the City or for general municipal purposes."

Bids for the bonds were opened on February 14, 1974. Plaintiffs (a syndicate consisting of two banks and thirteen other firms, all of whom deal in municipal bonds) submitted the bid which the city council accepted. Thereafter, on March 4, 1974, the

council by ordinance authorized issuance of the bonds. In Sec. 9 of the ordinance, it was stated that a tax was levied on all of the taxable tangible property in the City sufficient to produce enough revenue to pay the principal and interest falling due under the bonds, with a proviso that said indicated sums would be levied only to the extent that the sales tax proceeds are insufficient in any year to pay the interest and principal of the bonds. Sec. 10 of the Ordinance provided that the property taxes above levied, "if such levy becomes necessary due to the insufficiency of the sales tax proceeds," should be extended on the tax rolls and levied and collected at the same time and in the same manner as other city taxes and should be used to pay the bonds.

Plaintiffs agreed among themselves that if their bid was accepted they would ask the law firm of Stinson, Mag, Thomson, McEvers & Fizzell of Kansas City (hereinafter Stinson, Mag) to provide another legal opinion on the validity of the bonds in order to make them marketable nationally.[1] At plaintiffs' request, Linde, Thomson on March 18 or 19, 1974, delivered a copy of the bond transcript (the record, prepared by bond counsel, of all the proceedings that led up to and involved the bond issue) to Stinson, Mag for that purpose.

On March 21, 1974, a member of Stinson, Mag advised Linde, Thomson that it would be unable to render an opinion on the validity of the bonds, absent a decision thereon by a Missouri appellate court. His expressed reasons generally were the possible misleading of the voters by the December 11 ballot, the question of whether or not the city had the ability to pledge the sales tax proceeds to pay the bonds and, if it had such authority, whether it had effectively accomplished that pledge.

After learning of Stinson, Mag's position, Northern Trust Company, manager for plaintiffs, contacted Linde, Thomson which reiterated its position that the bonds were

---

1. Stinson, Mag had been in the municipal bond field for a much longer time than Linde, Thomson and were better known nationally.

valid and that it stood ready to give its opinion so stating as required in the bond offering. Thereupon, Northern Trust advised Linde, Thomson that they were going to bring the matter to the attention of the State Auditor who, under the provisions of § 108.240 (all statutory references are to RSMo 1969, V.A.M.S.), is to register all such bonds prior to negotiation.[2]

Northern Trust did contact Mr. Ashcroft, then State Auditor, explaining the positions of Linde, Thomson and Stinson, Mag. Mr. Ashcroft advised that he was going to take the bond transcript to the law firm of Charles & Trauernicht of St. Louis, another firm which had been in the municipal bond field for many years and was well known nationally. The parties agreed to delay closing from March 27 to March 29 to give the auditor additional time. Mr. Trauernicht then examined the bond transcript and wrote Ashcroft a letter expressing his views in which he expressed the same reservations advanced by Stinson, Mag, plus others.

On March 29, 1974, Mr. Ashcroft flew to Chicago, Illinois, with Mr. Kohn of Linde, Thomson and with the Independence Finance Director for the purpose of signing the bonds. En route Mr. Ashcroft discussed with Kohn the questions raised by Trauernicht but did not show him the letter. In Chicago they met with representatives of plaintiffs who inquired of Mr. Ashcroft as to what Charles & Trauernicht said about the bonds. Mr. Ashcroft stated that they had raised questions, some of which were the same as those advanced by Stinson, Mag, but that he had considered the questions and had concluded that it was his duty to sign the bonds. He then proceeded to do so. The bonds, the bond transcript, the Linde, Thomson opinion and the final delivery certificate were delivered to representatives of plaintiffs who paid the purchase price in accordance with their bid.

Following receipt of the bonds, a representative of plaintiffs stated that they still were desirous of obtaining a second opinion on the bonds and inquired of Mr. Ashcroft whether they should go to Charles & Trauernicht for such opinion. Mr. Ashcroft replied that he did not think that Charles & Trauernicht would give an opinion that the bonds were valid.

Many of the bonds had been sold by plaintiffs on a "when issued" basis prior to March 29, 1974, most of them on condition that a second legal opinion would be furnished. When that opinion was not obtainable from Stinson, Mag or Charles &

---

2. Sec. 108.240 provides as follows:

"Before any bond, hereafter issued by any county, township, city, town, village or school district or special road district by virtue of the provisions of chapters 243, 245, 248, and sections 242.010 to 242.690, RSMo, for any purpose whatever, shall obtain validity or be negotiated, such bonds shall first be presented to the state auditor, who shall register the same in a book or books, provided for that purpose, in the same manner as state bonds are now registered, and who shall certify by indorsement of such bond that all conditions of the laws have been complied with in its issue, if that be the case, and also that the conditions of the contract, under which they were ordered to be issued, have also been complied with and the evidence of that fact shall be filed and preserved by the auditor. Such bonds after receiving the said certificate of the auditor as herein provided, shall thereafter be held in every action, suit or proceeding in which their validity is, or may be, brought into question, *prima facie*, valid and binding obligations, and in every action brought to enforce collection of such bonds, the certificate of such auditor, or a duly certified copy thereof, shall be admitted and received in evidence of the validity of such bonds, together with the coupons thereto attached; provided, the only defense which can be offered against the validity of such bonds shall be for forgery or fraud. But this section shall not be construed to give validity *to any such bonds as may be issued in* excess of the limit fixed by the constitution, or contrary to its provisions, but all such bonds shall, to the extent of such excess, be held void; and provided further, that the remedy of injunction shall also lie at the instance of any taxpayer of the respective city, town, village, township or school district to prevent the registration of any bonds, alleged to be illegally issued or funded under any of the provisions of sections 108.240 to 108.300."

Trauernicht, plaintiffs concluded not to proceed with sale of the bonds pending determination of their validity by the courts.[3] This suit was then filed. It was tried to the court without a jury, the issue of damages being reserved for a subsequent separate trial if the court should find the bonds invalid and plaintiffs entitled to a recision.

On December 18, 1974, the trial court entered judgment in favor of defendants. It held the bonds to be valid and enforceable general obligation bonds, to the payment of which the City also had pledged revenues to be derived from the city-wide 1¢ sales tax. Detailed findings of fact and conclusions of law were made.

In the trial court and on appeal, appellants have asserted numerous grounds for holding the bonds invalid. Before considering those assignments, we must take cognizance of the fact that this is not a case which preceded registration of the bonds. In fact, there was no such litigation instituted.[4] Instead, plaintiffs, with full knowledge of all proceedings to authorize the bonds as disclosed in the bond transcript, made payment for the bonds and without asserting any conditions or reservations, accepted delivery thereof following registration by the state auditor. This fact is significant because § 108.240 (text given in footnote 2, *supra*) specifically restricts the availability of defenses which may be asserted against validity of the bonds after registration to forgery, fraud, or violations of constitutional restrictions or limitation.[5] Accordingly, we limit our consideration to those issues raised by appellants which fall

within one of these areas specified in § 108.-240.

The first such issue, and the principal basis for relief asserted by appellants, is that the bonds in question were not authorized by or issued in conformity with applicable constitutional provisions and that for this reason the bonds were invalid. General reference is made in this assignment to §§ 26(a) through 26(f), art. VI, Mo.Const., but the subsections specifically mentioned and discussed by appellants are subsections 26(a), (b), and (f), which provide as follows:

"Section 26(a). No county, city, incorporated town or village, school district or other political corporation or subdivision of the state shall become indebted in an amount exceeding in any year the income and revenue provided for such year plus any unencumbered balances from previous years, except as otherwise provided in this constitution.

"Section 26(b). Any county, city, incorporated town or village or other political corporation or subdivision of the state, by vote of two-thirds of the qualified electors thereof voting thereon, may become indebted in an amount not to exceed five per cent of the value of taxable tangible property therein as shown by the last completed assessment for state or county purposes, except that a school district by a vote of two-thirds of the qualified electors voting thereon may become indebted in an amount not to exceed ten per cent of the value of such taxable tangible property.

3. At time of trial all but $85,000 of the bonds were in the hands of members of the syndicate, either by reason of cancelled sales, repurchase or refusal of purchaser to accept delivery.

4. There was no suit by taxpayers to enjoin registration of the bonds as authorized by the proviso at the end of § 108.240. See footnote 2, *supra*. Plaintiffs brought no action prior to registration and purchase to determine validity of the proceedings and of the bonds to be issued pursuant thereto. On occasion, when questions as to the validity of a proposed bond issue arises, the state auditor declines to register them and validi-

ty of the bonds is determined in a proceeding in mandamus to compel registration, but that did not occur in this instance.

5. See *Lewis W. Thompson & Co. v. Conran-Gideon Special Road Dist.*, 323 Mo. 953, 19 S.W.2d 1049 (1929); 64 C.J.S. Municipal Corporations § 1949. The Texas courts have construed the purpose of a nearly identical statute as enhancing marketability of municipal bonds. *City of Belton v. Harris T. & S. Bank*, 273 S.W. 914, 922 (Tex.Civ.App. 1925); *Simpson v. City of Nacogdoches*, 152 S.W. 858, 861 (Tex.Civ.App.1912).

"Section 26(f). Before incurring any indebtedness every county, city, incorporated town or village, school district, or other political corporation or subdivision of the state shall provide for the collection of an annual tax on all taxable tangible property therein sufficient to pay the interest and principal of the indebtedness as they fall due, and to retire the same within twenty years from the date contracted."

■ There is no question but that the $14,420,000 of indebtedness represented by the bonds in question would be violative of § 26(a) if not authorized in accordance with other constitutional provisions. Thus, the first question which we must consider is whether the issuance of these bonds was authorized under § 26(b). This depends on whether the people approved and the City has issued general obligation bonds. If they did, the bonds (and the indebtedness they represent) were authorized in accordance with § 26(b) and are valid, there being no contention that the amount thereof exceeds the maximums specified in § 26(b). Approval of general obligation bonds by a two-thirds vote in accordance with § 26(b) includes approval of an ad valorem tax to pay the same as required under § 26(f). *State ex rel. Consolidated School District No. 8 v. Smith,* 343 Mo. 288, 121 S.W.2d 160 (banc 1938); *State ex rel. Gilpin v. Smith,* 339 Mo. 194, 96 S.W.2d 40 (banc 1936); *State ex rel. Emerson v. Allison,* 334 Mo. 542, 66 S.W.2d 547 (1933); *State ex rel. Audrain County v. Hackman,* 275 Mo. 534, 205 S.W. 12 (banc 1918).

Appellants contend that the bonds in question are not general obligation bonds but are limited obligation bonds in that they are payable primarily from sales tax receipts and only secondarily from ad valorem taxes. As such, say appellants, the bonds do not comply with the requirements of §§ 26(a), 26(b) and 26(f) for the reason that the people of Independence have not by a two-thirds vote pledged the sales tax proceeds to payment of these bonds and have approved the imposition of an ad valorem tax only in the event sales tax proceeds are insufficient to retire the bonds. In making these contentions, appellants rely primarily on the cases of *New Liberty Medical & Hospital Corp. v. E. F. Hutton & Co.,* 474 S.W.2d 1 (Mo. banc 1974), *Scroggs v. Kansas City,* 499 S.W.2d 500 (Mo.1973) and *Wunderlich v. City of St. Louis,* 511 S.W.2d 753 (Mo. banc 1974).

*New Liberty* is not applicable. There the hospital district proposed to build a new hospital by issuing 30 year debentures without any authorization by vote of the people. We held bad a lease arrangement whereby the hospital district, without any approval by the voters, unconditionally agreed to retire said bonds by paying for 30 years whatever rentals were necessary for that purpose. We concluded that this constituted an assumption of an indebtedness without voter approval in violation of § 26, art. VI, of the Missouri Constitution.

*Scroggs* involved a different factual situation but it likewise does not govern. In that case Kansas City Public Building Authority, a not-for-profit corporation, proposed to sell 30 year bonds in the amount of $25,000,000, using the proceeds to build and finance a convention center facility in Kansas City on land leased from the city. No provision for voter approval of these bonds was made. The Authority contracted to sublease the ground and all facilities to Kansas City for the sum of $54,931,379.38 which the city proposed to pay from revenue derived from new license taxes on the business of hotels, motels and restaurants and on the sale of cigarettes. In the lease the city agreed to maintain the convention center fund from which the bonds were to be retired for the full term of the lease, agreeing to continue the payment of rentals in accordance with the lease in all events even if the facility should be damaged or destroyed. We held that under *New Liberty* the city was assuming an indebtedness payable in all events without voter approval in violation of § 26 of art. VI of the Missouri Constitution.

In *Wunderlich* we considered an arrangement devised by the City of St. Louis to finance a convention center. The city submitted to the voters a proposal to issue "revenue and supported bonds" in the amount of $25,000,000 for the purpose of acquiring land and constructing thereon a convention center. The proposition submitted to the voters detailed a proposal which included a plan whereby operation and maintenance of the center were to be paid out of general revenue of the city, with debt service and reserve requirements for the bonds to be paid from the gross receipts derived from the operation of the center plus receipts of a convention and tourism tax and of the merchants' and manufacturers' tax. We held that the bonds were erroneously designated as revenue bonds and that, in fact, they were in the nature of limited obligation bonds. However, we held the bonds valid on the basis that the voters by a two-thirds vote had approved both the issuance of these bonds and the funding thereof from enumerated taxes. In response to the contention that these enumerated taxes could be repealed during the life of the bonds, we held to the contrary on the basis that the entire proposal had been approved by a two-thirds vote of the people and that if such a question arose, it could be resolved by mandamus.

█ If, as the appellants contend, the bonds in this case are something akin to the limited obligation bonds involved in *Wunderlich* (in that they are payable first from the sales tax), we would be compelled to hold the bonds invalid because the voters in this case have not approved by a two-thirds vote a proposition for the issuance of bonds specifically payable by a pledge of a designated tax (here the city sales tax) for the life of the bonds. *Wunderlich* requires voter approval by a two-thirds majority as a condition to the irrevocable commitment of a particular tax to the retirement of bonds payable in whole or in part therefrom. However, we have concluded that the bonds authorized were general obligation bonds. The propositions submitted to and approved by a two-thirds vote were a "[p]roposition to issue general obligation bonds in the amount of Thirteen Million Nine Hundred Twenty Thousand Dollars ($13,920,000.00) for the purpose of acquiring rights-of-way, constructing, extending, repairing and improving streets, bridges and related storm drainage facilities, including but not limited to Sterling Avenue from U.S. Highway 24 to U.S. Highway 40, Lee's Summit-Kiger Road from U.S. Highway 24 to U.S. Highway 40, Crysler Avenue from 23rd Street north to Truman Road and other improvements" and a "[p]roposition to issue general obligation bonds in the amount of Five Hundred Thousand Dollars ($500,000.00) for the purpose of acquiring sites for, erecting and furnishing fire stations." These were simple, clear-cut proposals for the issuance of general obligation bonds in specified amounts for particular purposes. They were approved by a two-thirds vote of the people. The fact that in the instructions to voters there was a statement that proceeds of the sales tax approved October 9, 1973, would be utilized to retire the bonds did not change the specific proposition voted upon and approved by the people, namely, whether to issue general obligation bonds.

It is true, as appellants contend, that the voters have not pledged the proceeds of the sales tax to the retirement of these bonds. The imposition of the sales tax was approved at a different election on October 9, 1973. The proceeds thereof were not pledged in that election to payment of bonds not even authorized until December. Nor did the voters in the subsequent December 11, 1973 election vote upon a pledge of the proceeds from the sales tax. That issue was not submitted to the voters in that election. The only pledge of the sales tax has been by action of the city council by ordinance. It was permissible for the city council to devote proceeds from the sales tax to service these bonds, just as it might utilize other available uncommitted funds for that purpose. However, this council or any subsequent council could repeal or alter that ordinance, at any time, and if it did so,

it would not be violating any mandate of the people resulting from either the October 9, 1973, or December 11, 1973 elections.

If these bonds were dependent, as in *Wunderlich,* upon this special tax and a pledge of the proceeds thereof, approval of the tax and the pledge thereof by a two-thirds majority at an election for that purpose would be essential to the validity of these bonds, but the bonds are not dependent thereon. Instead, they are general obligation bonds and, consequently, they are not invalid under the *Wunderlich* decision. Accordingly, we hold that the city in the issuance of these bonds has not violated the provisions of § 26, art. VI of the Missouri Constitution and that the bonds are not invalid on the basis of constitutional objections.

Next, appellants assert that the bonds are invalid for the reason that the voters were not afforded a fair and free opportunity to express their will because the ballot was misleading and deceptive and the voters were or could have been misled by the wording of the notice of election and the ballot. This contention is based upon inclusion in the instructions to voters of the language about use of the sales tax proceeds to retire the bonds. There may be some question as to whether this issue constitutes a claim of fraud which is one of the defenses made available after registration of the bonds pursuant to § 108.240. However, since this relates somewhat to the constitutional issues raised, we will consider the question.

The trial court with reference to this issue said:

"The voters of the City of Independence were not misled by the notice to voters calling for the election on said bonds; or by the instructions to voters at the election on December 11, 1973. Said notice and instructions did not imply that *ad valorem* property taxes would not be

levied by the City of Independence to pay the principal and interest on the said bonds, and the instructions and the notice did not imply that the city-wide sales tax would be in existence for any definite or specified period of time."

■ We agree with the trial court's finding. This is not to say that we express approval of the practice utilized herein of adding language in the instructions to voters on the ballot such as "these general obligation bonds will be payable first from the city-wide sales tax approved by the voters on October 9, 1973." Such or similar language should not be inserted in instructions to the voters. It has no place therein and political subdivisions would be well advised not to follow such practice in the future.[6] We have concluded, however, that the proposition submitted and voted on by the voters was clear and that the sentence in the instructions to voters with reference to utilization of the sales tax to retire these "general obligation bonds" did not mislead them or cause them to approve bonds which otherwise they might have rejected. In that connection we note that in the December 11, 1973 election there were six bond proposals voted upon, as to all of which these same instructions to voters applied. The voters rejected four of the six proposals. This does not indicate that the approval of two of the issues was on the basis of the sentence inserted in the instructions to voters. We overrule the contention that the bonds are invalid on the basis that the voters were misled by the language inserted in the instructions to voters.

■ Appellants assert various other grounds as a basis for holding the bonds invalid. These include claims (1) that the bonds are not authorized by the city charter; (2) that the bonds were not adopted in conformity with city charter provisions

---

**6.** What was done here differs from what this court approved in *City of Raytown v. Kemp,* 349 S.W.2d 363 (Mo. banc 1961), wherein the proposal to levy special assess-ments in connection with the sewer to be constructed with proceeds of the general obligation bonds was included in the proposition submitted to the voters for approval.

with respect to emergency ordinances in that there was no emergency and there were no proper recitals or showing of an emergency; (3) that the ballot was not in substantial conformity with the applicable statute; (4) that the delivery certificate was untrue in certifying that no controversy or litigation (threatened or pending) involved any question about the legality of the bonds; and (5) that the city in issuing the bonds had violated § 77q of Title XIV, U.S.C.A. (and its Missouri counterpart, § 409.411). None of these assignments, except possibly the last two, relate to defenses which are available after registration under the provisions of § 108.240. They should have been raised and litigated before registration if any of the parties desired to rely thereon. We cannot consider them now. Possibly, the claims that the delivery certificate was untrue and that § 77q of Title XIV, U.S.C.A. was violated, could be characterized as claims of fraud. In any event there is no merit thereto. The city furnished plaintiffs a copy of the bond transcript which included all of the proceedings involved in the authorization of the bonds. It disclosed the instructions to voters on the ballot, the fact that the voters did not vote on whether to pledge the sales tax proceeds to retirement of these bonds and that the only pledge of such tax was by an ordinance passed by the city council.[7] No fraud was shown.

We hold that the bonds are valid and the trial court correctly so held. However, it appears that some of the findings and conclusions entered may not be entirely consistent with what we have said herein. Accordingly, we reverse and remand with directions to enter findings, conclusions and judgment consistent with the views herein expressed.

SEILER, C. J., and MORGAN, HOLMAN, HENLEY and DONNELLY, JJ., concur.

BARDGETT, J., concurs in separate concurring opinion filed.

BARDGETT, Judge (concurring).

I concur in the opinion of Finch, J., and file this concurring opinion to re-emphasize disapproval of the language on the ballot, to wit: "These general obligation bonds will be payable first from a city-wide sales tax approved by the voters on October 9, 1973."

This language is nothing more than an argument which was probably used by the proponents in this bond election to persuade the people to vote for the bond issue. As such it should not have been on the ballot at all. The quoted statement could well have been understood by the voters to mean that ad valorem property taxes would not be available to retire the bonds.

However, I am willing to defer to the trial court's finding and the view expressed in the majority opinion that, in this case, the quoted language did not, in fact, deceive the voters, although I entertain substantial doubt on that question.

The passage of a general obligation bond issue by the voters constitutes an irrevocable commitment to subject their property to additional taxation over a substantial period of time. As such it is a matter of great importance to them. When the language on the ballot distracts the voter away from the proposition itself, and arguably leads the voter to think that a specific tax—sales tax—will be the source of the revenue to be used for bond retirement, the voter may well believe that other sources—ad valorem property taxes—will not be available for retirement of the bonds.

---

7. Plaintiffs complain that they were not shown the Charles & Trauernicht letter. However, this was obtained by the state auditor, not the city, and was in his possession. Representatives of the city had not seen it. The auditor told representatives of plaintiffs that Charles & Trauernicht had raised some questions about the bonds but he had decided to sign them. If plaintiffs had wanted more information, they could have asked the auditor therefor. The city did not have the letter and had not seen the letter.

834

In my opinion, the voter is entitled to know, *from the ballot itself*, that the bonds are general obligation bonds, the purpose and amount of the bonds, and the identity of the governmental entity which will issue them. The ballot must be a neutral instrument and not contain propaganda or arguments pro or con.

As stated *supra*, I concur in the opinion in this case but this does not mean that in future cases I would vote to approve similar language on general obligation bond issue ballots.