

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| PLATTE COUNTY, MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD83232 |
| | ) | |
| UMB BANK, N.A., THE TRUSTEE | ) | Opinion filed:  August 25, 2020 |
| OF THE TRANSPORTATION | ) | |
| REFUNDING AND IMPROVEMENT | ) | |
| BONDS (ZONA ROSA RETAIL | ) | |
| PROJECT) SERIES, 2007, | ) | |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI**
**THE HONORABLE JAMES W. VAN AMBURG, JUDGE**

Division Two:  Karen King Mitchell, Presiding Judge,
Anthony Rex Gabbert, Judge and W. Douglas Thomson, Judge

UMB Bank, N.A. ("Trustee") appeals from the trial court's grant of summary judgment

("Judgment") in favor of Platte County, Missouri ("County") and against Trustee finding that the

financing agreement ("Financing Agreement") does not contain any promise by the County to pay

shortfalls for the Transportation Refunding and Improvement Bonds ("Zona Rosa Retail Project")

Series 2007 ("Zona Rosa Bonds").  On appeal, Trustee claims the trial court erred in its Judgment

because the County made a conditional promise to pay shortfalls for the Zona Rosa Bonds in the

Financing Agreement.  We find that the plain language of the Financing Agreement does not

contain a promise by the County to pay for the shortfalls for the Zona Rosa Bonds.  We affirm.

**Factual and Procedural History**

The material facts are not in dispute. On October 1, 2007, the Industrial Development Authority of Platte County ("Development Authority") issued the Zona Rosa Bonds in the amount of $32,200,000. The Zona Rosa Bonds refunded the outstanding amount of the series 2003 bonds (which was $18,610,000) and provided funding for the construction of parking garages at Zona Rosa Town Center ("Zona Rosa"), an outdoor shopping mall located in Platte County, Missouri. The Zona Rosa Bonds are revenue bonds.

On the same date and in connection with the issuance of the Zona Rosa Bonds, the Development Authority executed the Trust Indenture with Trustee and the Financing Agreement with the County, and Platte County, Missouri South Transportation Development District I and District II ("Districts I and II"). Pursuant to the Trust Indenture, Trustee agreed to undertake certain duties and responsibilities as corporate trustee of the Zona Rosa Bonds and represents the interests of the holders of the Zona Rosa Bonds ("Bondholders"). Under the terms of the Trust Indenture and the Financing Agreement, the Development Authority assigned its rights under the Financing Agreement to Trustee.

The Financing Agreement is a fully integrated contract[1] which provides the source of revenue used to pay the principal and interest on the Zona Rosa Bonds. The County is a first-class county without a charter government, governed by a County Commission composed of three elected commissioners. Districts I and II are special taxing districts formed under state law to support transportation-related retail projects like the parking garages at Zona Rosa. Pursuant to the Financing Agreement, the Zona Rosa Bonds are paid from revenues generated by a 1% sales

---

[1]"An integrated agreement simply means that the writing in question is a complete statement of the bargain made between the parties." *Centerre Bank of Kansas City, N.A. v. Distributors, Inc.*, 705 S.W.2d 42, 51 (Mo. App. W.D. 1985) (citing 4 Williston, Contracts, § 636 (3rd ed. 1961)). "The reason for the rule, of course, is that the parol evidence rule only prohibits evidence of prior or contemporaneous agreements which vary or contradict the terms of an unambiguous and complete writing." *Id.*

tax collected by Districts I and II on retail sales within their respective boundaries, which includes Zona Rosa. The County does not control or operate Districts I or II. Instead, Districts I and II are distinct legal entities that collect the 1% sales tax at Zona Rosa. Article II of the Financing Agreement outlines the obligations of the County, which provides:

> **Section 2.2. Annual Appropriations.** The County intends, on or before the last day of each Fiscal Year, to budget and appropriate, specifically with respect to this Agreement, moneys sufficient to pay the Appropriation Amount[2] for the next succeeding Fiscal Year. The County shall deliver written notice to the Trustee no later than 15 days after the commencement of its Fiscal Year stating *whether or not the County Commission has appropriated funds* in an amount equal to the Appropriation Amount estimated to become due during such Fiscal Year. Notwithstanding any provision in the Indenture or herein to the contrary, if the Letter of Credit is in effect, the parties hereto agree that such Letter of Credit shall be drawn on prior to any payment of the Appropriation Amount by the County.

> **Section 2.3. Annual Budget Request.** The County further covenants that its responsible financial officer[3] shall do all things lawful within his power to obtain and maintain funds from which the Appropriation Amount may be paid, including making provision for such payments to the extent necessary in each proposed budget or appropriation request submitted for adoption in accordance with applicable provisions of law and to exhaust all available reviews and appeals in the event such portion of the budget or appropriation request is not approved; *it being the intention of the County that the decision to appropriate or not to appropriate under this Agreement shall be made solely by the County Commission* and not by any other official of the County.

> **Section 2.4. Appropriation to Constitute Current Expenses.** The parties hereto acknowledge and agree that the Appropriation Amount shall constitute currently budgeted expenditures of the County and *shall not in any way be construed or interpreted as creating a liability or a general obligation or debt of the County* in contravention of any applicable constitutional or statutory limitations or requirements concerning the creation of indebtedness by the County, *nor shall anything contained herein constitute a pledge of the general credit, tax revenues, funds or moneys of [the] County.* The County's obligations under this Agreement shall be from year to year only, and shall not constitute a mandatory payment obligation of the County in any ensuing Fiscal Year beyond the then current Fiscal Year.

---

[2]The Appropriation Amount is the entire principal and interest to be paid by the Trustee to the Zona Rosa Bondholders in a given year.

[3]The "responsible financing officer" identified in section 2.3 of the Financing Agreement is the Platte County Auditor ("Auditor").

(Emphasis added).

In addition to the 1% sales tax, Trustee and Zona Rosa Development, Inc., ("Developer") executed a Developer Guaranty Agreement under which Developer was obligated to post a $500,000 Letter of Credit that could be drawn on by the Trustee as security for the Zona Rosa Bonds. Under sections 3.10 and 4.10 of the Financing Agreement Districts I and II were to guarantee the availability of the Letter of Credit and, as necessary, post it themselves if the Developer failed to post or maintain it. Under the Trust Indenture, the Development Authority also established a $3.1 million Reserve Fund which could be used for payment on the Zona Rosa Bonds. The Reserve Fund had a balance of $3,030,920.38 on December 3, 2018.

Shortfalls occurred in the payment of the Zona Rosa Bonds. Until 2017, the Developer used its own private funds to cover the annual shortfall in revenue for payment on the Zona Rosa Bonds. On or about November 16, 2017, the Trustee drew on the $500,000 Letter of Credit originally posted by the Developer. In a letter dated November 22, 2017, the Trustee informed the County that the Letter of Credit had been drawn on but did not make demand on the County to pay the Zona Rosa Bonds. On November 29 and December 13, 2017, the Trustee made a written demand to the Developer to replenish the Letter of Credit but the Developer did not comply. In February 2018, Trustee notified Developer that legal action would be taken if a replacement Letter of Credit was not in place by April 2018. Trustee also demanded that Districts I and II replace the Letter of Credit. The Letter of Credit was not replaced by the Developer or Districts I and II. In September 2018, the Developer sold its interest in Zona Rosa to Monarchs Sub, LLC ("Monarchs"). Trustee made demand on Monarchs to replace the Letter of Credit but Monarchs did not comply. Trustee did not take any legal action against Developer, Monarchs, or Districts I and II but informed the Bondholders that these entities were in default.

4

On September 24, 2018, approximately a year after drawing on the Letter of Credit, Trustee sent the County written notice of default under the Financing Agreement threatening to sue the County unless it issued a binding written commitment to pay the revenue shortfall on the debt service due December 1, 2018.[4] On or about October 12, 2018, the Trustee informed the County and Districts I and II, along with the Developer and the Development Authority, that "there is a shortfall of $1,015,257.66." On November 2, 2018, the County filed a petition for declaratory relief against Trustee and the Development Authority[5] seeking declaration of its legal obligations with respect to the Zona Rosa Bonds pursuant to the Financing Agreement. Prior to filing its answer, Trustee filed a petition for temporary restraining order requesting that the court order the County to pay the full amount of the appropriation made by the County in its 2018 budget regarding the Zona Rosa Bonds. On November 30, 2018, the court held a hearing on Trustee's petition for a temporary restraining order at which Trustee stated that the amount of the shortfall on the payment to Bondholders due December 1, 2018, was $838,594.00, which was later revised to $765,390.95. The trial court denied Trustee's petition for a temporary restraining order but ordered the County to reserve $765,390.95 for purposes of this litigation which the County designated as restricted funds within its general reserve fund.

---

[4]Prior to 2018, Trustee never made a demand on the County to pay a shortfall. Pursuant to the Financing Agreement, from 2008 to 2018, the Auditor proposed and the County budgeted and appropriated the full amount of principal and interest to be paid by the Trustee to Bondholders. The County fund from which payment could be made for the Zona Rose Bonds is the "Zona Rosa TDD Fund," which is categorized as a debt service fund. The County operates on a ledger system, which means potential expenditures are paid out of a general fund, special revenue funds or debt service funds. The appropriations made in 2008 through 2018, did not result in any transfer of money or funds from the County's general fund to the Zona Rosa TDD Fund. There has never been a cash balance in the County treasury to the credit of the Zona Rosa TDD Fund; it has always had a zero cash balance. From 2007 until 2018, the County was never asked to make any payment regarding the Zona Rosa Bonds. The County has never made a payment to Trustee related to the Zona Rosa Bonds.

The County Commission makes *final* appropriation of funds by issuing its Warrant. The County Commission has never made final appropriation by issuing its Warrant for payment of funds from the general fund or the general reserve fund to the Zona Rosa TDD Bond Fund.

[5]The County voluntarily dismissed the Development Authority on December 17, 2018.

5

The County filed a motion for summary judgment. Trustee filed an opposition to the County's motion for summary judgment and cross-motion for summary judgment. The trial court entered its Judgment in favor of the County finding that the County was not liable on the Zona Rosa Bonds as the County did not promise to make payments on the Zona Rosa Bonds in the Financing Agreement. Specifically, the trial court made the following findings:

1. In 2007, the Development Authority . . . issued bonds to finance the construction of garages within Zona Rosa. . . . The Development Authority is a distinct legal entity from Platte County. *State ex rel Jardon v. Industrial Dev. Auth. of Jasper Cnty*, 570 S.W.2d 666, 677 (Mo. banc 1978).

2. On October 1, 2007, the Development Authority entered into a Financing Agreement with [Districts I and II] to provide revenue for the Zona Rosa Bonds using a 1% sales tax in Zona Rosa. Platte County also entered into the Financing Agreement.

3. In its Petition, Platte County asks the Court to make certain declarations regarding the Financing Agreement. The Development Authority's interests in the Financing Agreement have been assigned to [Trustee], which represents the holders of the Zona Rosa Bonds as Trustee.

4. The Court finds that the Financing Agreement is a fully integrated contract entered into between parties. It is to be construed in accordance with its express terms. [Section] 432.070*; Gill Const., Inc. v. 18th & Vine Auth*., 157 S.W.3d 699, 708 (Mo. App. 2004). The Court further finds that the declarations sought by Platte County involve legal issues that are appropriately resolved on summary judgment. *Webbe v. Keel*, 369 S.W.3d 755, 756 (Mo. App. 2012).

5. In Section 2.3 of the Financing Agreement, Platte County covenanted that, each year, the Platte County Auditor would include within its proposed budget a potential payment for the Zona Rosa Bonds. The Court finds that this is an express promise that is not illusory. *See Moschenross v. St. Louis Cnty*, 188 S.W.3d 13, 21 (Mo. App. 2006) (agreement was "to request annual appropriations for repayment of the bonds, subject to approval of the county council."). Accordingly, each year, the Auditor should include within its proposed budget a potential payment for the Zona Rosa Bonds.

6. There is no promise or requirement in the Financing Agreement that the County Commission must accept the Auditor's proposed budget and appropriate for a potential payment. To the contrary, Section 2.3 of the Financing Agreement recognizes that the County Commission may decide each year whether to appropriate or not to appropriate for a potential payment on the Zona Rosa

6

Bonds. This is consistent with Missouri law. *Scroggs v. Kansas City*, 499 S.W.2d 500, 505 (Mo. 1973) (indicating that an agreement would be prohibited if "it requires continuing future appropriations . . . .").

7. Similarly, there is no promise or requirement in the Financing Agreement for Platte County to make payment on the Zona Rosa Bonds. In fact, in Section 2.4, the Financing Agreement specifically states that it "shall not in any way be construed or interpreted as creating a liability or a general obligation or debt of the County . . . nor shall anything contained herein constitute a pledge of the general credit, tax revenues, funds or moneys of County." The Trustee has admitted that the bonds are not secured by the full faith and credit and taxing power of Platte County.

8. Because the Financing Agreement does not contain any promise by Platte County to appropriate or pay shortfalls for the Zona Rosa Bonds, voter approval for county indebtedness was not required under Article VI, Section 26(b) of the Missouri Constitution. *See Scroggs v. Kansas City*, 499 S.W.2d 500, 505 (Mo. 1973). For the same reason, there is no violation of [section] 50.660 because there is no "contract . . . imposing any financial obligation" on Platte County. Lastly, there is no violation of [section] 349.080 because, under the terms of the Financing Agreement, Platte County is not liable on the bonds issued by the Development Authority.[6]

Trustee filed a motion to amend the Judgment requesting the trial court to direct that the County pay $765,390.95 to Trustee for the 2018 shortfall; to address the County's burden for summary judgment; and enter summary judgment in favor of Trustee for reasons that it argued in its previously filed pleadings. By operation of law, Trustee's motion was deemed denied when the trial court did not rule on it within ninety days pursuant to Rule 78.06.[7] Trustee appeals.

---

[6]We note that both parties in their respective pleadings request attorneys' fees in their prayers for relief. The trial court's judgment did not dispose of these requests, "which '*can* arrest the finality of the judgment,' and implicate this Court's jurisdiction to hear the appeal." *Union Manor v. Missouri Dep't of Health and Senior Servs.*, 596 S.W.3d 673, 677 n.2 (Mo. App. W.D. 2020) (quoting *Ruby v. Troupe*, 580 S.W.3d 112, 114 (Mo. App. W.D. 2019)). A trial court's "failure to address an attorneys' fees issue will impact the finality of the judgment only when the claim is properly pleaded *and* pursued by the requesting party. Under the first step, 'a party must plead a basis for an award of fees, ***in addition to simply including a request for attorneys' fees in its prayer for relief*.'" *Id.* (citation omitted). Here, each party only states a bare request for attorneys' fees without citing any authority for such an award; thus, the request for attorneys' fees was not properly pleaded. *Id.* Nor does it appear that any party pursued its request for attorneys' fees beyond merely mentioning it in their respective petitions or answer. *Id.* "Under *Ruby*, this is an additional independent reason for deeming the [trial] court's judgment final and appealable, notwithstanding its failure to address the issue of attorneys' fees." *Id.*

[7]All references to Rules are to Missouri Rules of Civil Procedure (2020), unless otherwise indicated.

**Standard of Review**

"Appellate review of the grant of summary judgment is essentially *de novo*." *Newton v. Mercy Clinic E. Communities*, 596 S.W.3d 625, 628 (Mo. banc 2020). "'The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially.'" *Id.* (citation omitted). "This Court reviews the record in the light most favorable to the party against whom judgment was entered." *Id.* "'Summary judgment is appropriate when the moving party has [established], on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law.'" *Id.* (quoting *Am. Fed'n of Teachers v. Ledbetter*, 387 S.W.3d 360, 362-63 (Mo. banc 2012)).

**Analysis**

As asserted by Trustee in its oral argument, this is a simple contract case in which the terms of the contract, the Financing Agreement, are clear and unambiguous on its face. Trustee raises six points on appeal. As Points I through V are based on Trustee's assertion that the Financing Agreement contains a promise by the County to pay the shortfall for the Zona Rosa Bonds, we begin with an analysis of the County's obligations under the Financing Agreement.

"'The interpretation of a contract is a question of law.'" *Nodaway Valley Bank v. E.L. Crawford Const., Inc.*, 126 S.W.3d 820, 825 (Mo. App. W.D. 2004) (citation omitted). "The cardinal rule of contract interpretation is to ascertain the parties' intentions and to give effect to that intention." *Care Center of K.C. v. Horton*, 173 S.W.3d 353, 355 (Mo. App. W.D. 2005). "To do that, this court is to rely on the plain and ordinary meaning of the words in the contract and 'consider the document as a whole.'" *Nodaway Valley Bank*, 126 S.W.3d at 825 (citation omitted). "If a contract is unambiguous, 'the intent of the parties is to be discerned from the contract alone'

8

based on the plain and ordinary meaning of the language used." *Whelan Sec. Co v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012) (citation omitted). "Mere disagreement over the meaning of a contract does not signal an ambiguity." *Goldstein and Price, L.C. v. Tonkin & Mondl, L.C.*, 974 S.W.2d 543, 552 (Mo. App. E.D. 1998).

Here, as agreed by Trustee at oral argument, the contract language addressing the County's obligations is not ambiguous. Article II of the Financing Agreement provides:

> **Section 2.2. Annual Appropriations.** The County intends, on or before the last day of each Fiscal Year, to budget and appropriate, specifically with respect to this Agreement, moneys sufficient to pay the Appropriation Amount for the next succeeding Fiscal Year. The County shall deliver written notice to the Trustee no later than 15 days after the commencement of its Fiscal Year stating ***whether or not the County Commission has appropriated funds*** in an amount equal to the Appropriation Amount estimated to become due during such Fiscal Year. Notwithstanding any provision in the Indenture or herein to the contrary, if the Letter of Credit is in effect, the parties hereto agree that such Letter of Credit shall be drawn on prior to any payment of the Appropriation Amount by the County.

> **Section 2.3. Annual Budget Request.** The County further covenants that its responsible financial officer shall do all things lawful within his power to obtain and maintain funds from which the Appropriation Amount may be paid, including making provision for such payments to the extent necessary in each proposed budget or appropriation request submitted for adoption in accordance with applicable provisions of law and to exhaust all available reviews and appeals in the event such portion of the budget or appropriation request is not approved; ***it being the intention of the County that the decision to appropriate or not to appropriate under this Agreement shall be made solely by the County Commission*** and not by any other official of the County.

> **Section 2.4. Appropriation to Constitute Current Expenses.** The parties hereto acknowledge and agree that the Appropriation Amount shall constitute currently budgeted expenditures of the County and ***shall not in any way be construed or interpreted as creating a liability or a general obligation or debt of the County*** in contravention of any applicable constitutional or statutory limitations or requirements concerning the creation of indebtedness by the County, ***nor shall anything contained herein constitute a pledge of the general credit, tax revenues, funds or moneys of [the] County.*** The County's obligations under this Agreement shall be from year to year only, and shall not constitute a mandatory payment obligation of the County in any ensuing Fiscal Year beyond the then current Fiscal Year.

(Emphasis added).

The plain and ordinary meaning of the language used in these provisions supports the trial court's Judgment that the Financing Agreement does not contain a promise by the County to pay on the Zona Rosa Bonds. Section 2.2 plainly provides that each year the County intends to budget for the Appropriation Amount which will be subject to the County Commission's approval, which the County Commission may or may not provide. It includes a directive that in the event the County Commission does not approve the appropriation, the County will notify the Trustee within fifteen days of the beginning of the fiscal year. It also provides that if the Letter of Credit is in effect, it must be drawn on prior to any payment by the County. Section 2.3 clearly and unambiguously provides that each year the Auditor will include a payment for the Zona Rosa Bonds in its proposed budget or appropriation request and pursue all available appeals in the event it is not approved. Consistent with the language of section 2.2, section 2.3 expressly provides that it is the intent of the County that the County Commission solely decides whether "to appropriate or not appropriate." Similarly, section 2.4 clearly and unambiguously provides that the Appropriation Amount constitutes a budgeted expenditure and not a liability. Section 2.4 also expressly provides that the County is not pledging County money. There is no promise to pay expressed in any of these provisions. In fact, the provisions repeatedly state that the decision whether to pay or not is entirely up to the County Commission and provides directives to take in the event the County Commission does not approve the proposed appropriation.[8] The provisions

---

[8]Indeed, it appears Trustee was aware that the Financing Agreement did not bind the County unless the County Commission took the additional step of appropriating the Appropriation Amount and issuing its Warrant. On September 24, 2018, Trustee sent the County written notice of default under the Financing Agreement threatening to sue the County *unless* the County issued a *binding* written commitment to pay the revenue shortfall on the debt service.

10

are devoid of any requirements on the County Commission to accept the proposed appropriation, and, in fact, the County Commission never did make final appropriation of funds for this purpose.

In contrast, sections 3.2(d)(ii)(A) and 4.2(d)(ii)(A) of the Financing Agreement regarding the obligations of Districts I and II contain language which plainly reflect a promise to pay. In those sections, the Districts I and II promised to collect the sales tax within their boundaries and make "[p]ayment to the Trustee of the amount necessary to fund clauses *First* through *Third* of Section 601(b)(6) of the Indenture," along with other payments related to the Zona Rosa Bonds. Under section 3.3 and 4.3 of the Financing Agreement, Districts I and II specifically agreed that appropriated funds "are pledged . . . to payment of District Operating Costs and the Bonds and shall be transferred . . . to the Revenue Fund at the times and manner provided in [Section 3.2(d) and Section 4.2(d)]." The provisions of the Financing Agreement pertaining to the County are different from the provisions pertaining to Districts I and II. Unlike sections 3.2(d) and 4.2(d) of the Financing Agreement, which pertain to Districts I and II, there is no language in Article II requiring the County to "disburse the proceeds" or make "payment to the Trustee" of any funds. Unlike sections 3.3 and 4.3 of the Financing Agreement for Districts I and II, there is no language in Article II in which funds appropriated by the County in its budget "are pledged . . . to payment of . . . the Bonds . . . ."

Our analysis of the plain language of the Financing Agreement is consistent with other documents executed in conjunction with the issuance of the Zona Rosa Bonds in October 2007. The Trust Indenture likewise recognizes that the Zona Rosa Bonds "shall not constitute a debt or liability of the County[.]" Section 202 of the Trust indenture is entitled "Limited Obligations" and provides:

> The Bonds and the interest thereon shall be special, limited obligations of the Authority payable solely out of the Pledged Revenues (including, in certain

11

circumstances, Bond proceeds, draws on the Letter of Credit and income from the temporary investment thereof and moneys on deposit in the Bond Reserve Fund and income from the investment thereof) and are secured by a pledge and assignment of the Trust Estate to the Trustee in favor of the Registered Owners of the Bonds, as provided in this Indenture. ***The Bonds and the interest thereon shall not constitute a debt or liability of the County or of the State or of any political subdivision thereof, and the Bonds shall not constitute an indebtedness*** within the meaning of any constitutional or statutory debt limitation or restriction. The Authority has no taxing powers.

(Emphasis added). Moreover, in a letter to Trustee and the Development Authority dated October 4, 2007, bond counsel Gilmore & Bell specifically advised the Trustee that under existing law:

The [Zona Rosa] Bonds do not constitute a debt or liability of the State or of any political subdivision . . . and do not constitute a pledge of the full faith and credit of the State or of any political subdivision thereof. The issuance of the [Zona Rosa] Bonds shall not, directly, indirectly or contingently, obligate the State or any political subdivision thereof to levy any form of taxation therefor or to make any appropriation for their payment.

We conclude that the plain language of Financing Agreement does not reflect that the County made a promise to make payment on the Zona Rosa Bonds.

*Point I*

In Point I, Trustee argues that the trial court erred in granting summary judgment in favor of the County because the County's promise to pay on the Zona Rosa Bonds in the Financing Agreement is constitutional because the County had sufficient income and revenue to pay the amounts promised as required by Article VI, section 26(a) of the Missouri Constitution. In support of this argument, Trustee offers no analysis of the provisions of the Financing Agreement or states what language it believes constitutes County's promise to pay on the Zona Rosa Bonds. Trustee concludes its argument by stating, "The Circuit Court erred by finding the County's promises were unconstitutional, and the summary judgment ruling in favor of the County must be reversed. The Trustee is entitled to summary judgment as there is no genuine issue as to the material facts."

12

First, this point fails in light of our analysis concluding that the plain language of the Financing Agreement does not contain a promise to pay by the County. Second, Trustee's argument fails because the trial court ***did not*** find "the County's promises were unconstitutional," as alleged by Trustee. The trial court did not find any part of the Financing Agreement unconstitutional. The trial court did not even mention Article VI, section 26(a) in its Judgment. Contrary to Trustee's argument, the trial court found that "Because the Financing Agreement ***does not contain any promise*** by Platte County to appropriate or pay shortfalls for the Zona Rosa Bonds, voter approval for country indebtedness was not required under Article VI, Section 26(b)." (Emphasis added.)

Finally, Trustee simply asserts County made a promise to pay without any analysis in support. Moreover, Trustee asserts the trial court erred in making a finding that is not reflected in the Judgment. Trustee fails to explain how the law supports any claim of reversible error. *Id.*

> Rule 84.04 sets forth various requirements for appellate briefs and compliance with these requirements is mandatory in order to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made. Pursuant to these requirements, an argument must explain why, in the context of the case, the law supports the claim of reversible error. It should advise the appellate court how principles of law and the facts of the case interact. Further, if a party fails to support a contention with argument beyond mere conclusions, the point is considered abandoned.

*Office of Admin. v. Pharmacy Corp. of Am.*, 586 S.W.3d 318, 325 (Mo. App. W.D. 2019) (citations and internal quotation marks omitted).

Point I is denied.[9]

---

[9]To the extent that Trustee make additional arguments for the first time in its reply brief, we are precluded from addressing them because the County has no opportunity to respond. *Berry v. State,* 908 S.W.2d 682, 684 (Mo. banc 1995). We note the County sought leave to file a sur-reply, which was denied. In its motion, the County argued that the Trustee argued for the first time in its reply brief that the Zona Rosa Bonds fall under a special category of "Non-Bond Legal Obligations" under which the County undertook obligations to pay shortfalls for the Zona Rosa Bonds that are different from general obligations, revenue bond obligations, or moral obligations. "[P]oints and arguments omitted from an appellant's initial brief may not be supplied by a reply brief." *Coyne v.*

*Point II*

In Point II, the Trustee contends that the trial court erred in granting summary judgment in favor of the County because the trial court violated multiple rules of contract interpretation by holding that the Financing Agreement imposed only a moral obligation when the County made a conditional promise to pay. We disagree.

First, Trustee argues that the language of the first sentence of section 2.2 supports its argument that the County made a conditional promise to pay, which states that "[t]he County intends on or before the last day of each Fiscal Year, to budget and appropriate, specifically with respect to this Agreement, moneys sufficient to pay the Appropriation Amount." Trustee argues that the plain meaning of the word "intends" is "to have in mind as a goal" and concludes that the County's goal was to appropriate money sufficient to pay the principal and the interest due on the Zona Rosa Bonds for the fiscal year. Trustee claims that this "goal" is conditioned on, *without any reference to*, Article VI, section 26(a) of the Missouri Constitution, which requires that the County's expenditures do not exceed income and revenues for the year plus prior year's unencumbered property.[10] We disagree with Trustee's interpretation as it is contrary to the plain language of the Financing Agreement. We do not find that this sentence contains a conditional promise. The plain and ordinary meaning of this sentence means that the County intends to budget and appropriate moneys sufficient to pay the Appropriation Amount for the next Fiscal year. It is undisputed that is exactly what the County did. In fact, in response to the County's statement of

---

*Coyne*, 17 S.W.3d 904, 906 (Mo. App. E.D. 2000). Nonetheless, Trustee's argument in the reply brief still fails as it remains premised on its assertion that the Financing Agreement contains a promise to pay by the County.

[10]Article VI, section 26(a) provides: "No county, city, incorporated town or village, school district or other political corporation or subdivision of the state shall become indebted in an amount exceeding in any year the income and revenue provided for such year plus any *unencumbered balances* from previous years, except as otherwise provided in this constitution." (Emphasis added). Trustee's argument refers to "unencumbered property" but Article VI, section 26(a) references "unencumbered balances." Trustee's mischaracterization has no effect on our analysis.

14

uncontroverted facts, Trustee conceded that from 2008 to 2018 the Auditor proposed and the County budgeted and appropriated the Appropriation Amount every year. Trustee fails to demonstrate how the plain language of section 2.2 contains a promise to pay the Appropriation Amount. Contrary to Trustee's argument, the very next sentence provides how and when the County shall notify Trustee "***whether or not*** the County Commission has appropriated funds[.]" (Emphasis added.) The plain and ordinary meaning of this language indicates that although the County may be committing to budget and appropriate funds in the amount of the Appropriation Amount, the *Commission* must then decide to appropriate the funds or not.

Second, Trustee argues that an interpretation that the County may appropriate or not appropriate is inconsistent with the parties' intention as it renders the intention language meaningless and allows the County to escape performance of anything detrimental to itself. We disagree. The intention language is not meaningless, it provides that every year the County will budget and appropriate for the Appropriation Amount but that the proposed appropriation must be approved by the County Commission by its Warrant. The plain language of the Financing Agreement repeatedly provides that approval of the appropriation is at the discretion of the County Commission. Trustee cites *Magruder Quarry & Co., LLC v. Briscoe*, 83 S.W.3d 647 (Mo. App. E.D. 2002) for the statement that, "Frequently a court will find an apparently illusory promise to be accompanied by an implied promise to use 'best efforts' or 'reasonable efforts" but that statement is not applicable here. County did not promise to use best or reasonable efforts to pay, County did not promise to pay at all. It is undisputed that the Zona Rosa Bonds are revenue bonds to be paid from the 1% sales tax collected by Districts I and II. A Letter of Credit was also in place as was a Reserve Fund. Under the express and plain terms of the Financing Agreement, the County was never obligated to pay the shortfall on the Zona Rosa Bonds. The County obligated itself to

15

*consider* whether to pay on the Zona Rosa Bonds by proposing a payment in the budget for the County Commission's approval. However, unless and until the County Commission made final, specific approval of the appropriation by its Warrant, a step which had to occur at some point after approval of the County budget, no payment would ever be made to Trustee. This final approval by Warrant never occurred. Similarly, in *Moschenross v. St. Louis County*, 188 S.W.3d 13, 20-21 (Mo. App. E.D. 2006), the financing agreement did not result in debt incurred by the county because the agreement "was merely to request annual appropriations for repayment of the bonds, subject to the approval of the county council."

Moreover, although the trial court did not use the term "moral obligation" in its Judgment, such a characterization is consistent with the County's role here, and as described below provides an incentive to the County to voluntarily make payment on bonds even when not required to do so.

> A moral obligation is a form of credit enhancement typically provided by a government to another entity. Generally, a highly credit-worthy government pledges its 'moral obligation' to enhance a specific borrowing by a government of lesser credit quality. The debt is usually issued by a separate government entity, and the morally obligated government typically pledges to consider appropriating funds to replenish a debt service reserve that has been drawn upon. Creditor recourse in the event of non-payment is very limited for moral obligations, which, as the name suggests, are based more on good faith and a belief in market discipline than on legally enforceable covenants. . . . The moral obligation pledge is neither a guarantee to pay debt service or replenish a debt service reserve, nor is it a legal obligation to seek appropriation to pay for debt service or refill a reserve. Rather, it is the declaration that the pledging entity intends to support the debt with appropriations and will consider providing funding under certain circumstances. . . . While a moral obligation is weaker than a legal obligation to pay debt service, the entity providing the moral obligation pledge is signaling its support for the transaction to investors. Therefore, as with lease-backed obligations and non-lease annual appropriation obligations, the failure of a government to honor its moral obligation commitment is generally an indicator of severe stress that would likely result in negative rating action on the government's [general obligation] rating. Similarly, in weighing the decision whether or not to honor a moral obligation, governments typically consider the market impact of the decision. The potential

16

impact is usually sufficient to motivate the government to make the moral obligation appropriation, absent severe stress.

Rachel Cortez et al., *Rating Methodology: Lease, Appropriation, Moral Obligation and Comparable Debt of US State and Local Governments*, Moody's Investors Service, (July 9, 2018) at 7-8. Any such moral obligation, however, does not bear on the plain and ordinary meaning of the Financing Agreement.[11]

Third, Trustee argues that had the County intended to maintain absolute discretion over its appropriation obligations it could have expressly specified that a failure to make a payment would not constitute an event of default. However, a default presupposes a contractual obligation. There would be no reason to provide language regarding a default because the County was not contractually obligated to pay on the Zona Rosa Bonds in the first place. Nonetheless, the language included in section 2.4 plainly states that the County is not liable and is not pledging County money.

Finally, regarding section 2.4 of the Financing Agreement, Trustee argues that the trial court failed to recognize the following language, "[t]he County's obligations under this Agreement shall be from year to year only, and shall not constitute a mandatory payment obligation of the County in any ensuing Fiscal Year beyond the then current Fiscal Year." Trustee claims that the court would have to delete the words "mandatory payment obligation" to hold that the County has no payment obligation in the current Fiscal Year. We disagree. It is clear from the plain language of these provisions *taken as a whole* that no payment is mandatory until the County Commission approves it. This language operates simply to preclude the County Commission from approving a payment for a future fiscal year.

---

[11]We do not intend to impugn the soundness of County's credit nor speculate on the effect of the County's decision on its credit rating. However, an understanding of the County's role in these highly-sophisticated financial instruments is necessary to understand this situation.

17

Point II is denied.

*Point III*

In Point III, the Trustee argues that the trial court erred in entering summary judgment in favor of the County because it relied on authorities that addressed unconditional promises, rather than conditional promises, in that the County's obligation to appropriate is conditioned on the appropriation being permitted by the Missouri Constitution in a given year and the County's obligation to pay is also conditioned on the insufficiency or unavailability of other payment sources for the bonds.

In light of our analysis concluding that the plain language of the Financing Agreement does not contain a conditional (or unconditional) promise to pay, this point fails.

Point III is denied.

*Point IV*

In Point IV, Trustee argues that the trial court erred in granting summary judgment in favor of the County because the trial court failed to acknowledge that the Trustee can assert equitable defenses as it was assigned the rights of the Development Authority, a public entity, under the Financing Agreement. Trustee asserts the equitable defenses bar the County from "arguing that the Financing Agreement means something other than a guaranty of a shortfall on an annual basis when certain conditions precedent are satisfied under the doctrines of estoppel, laches, waiver, and unclean hands" because the County admitted such an obligation and received millions of dollars in benefits from Zona Rosa.

Even assuming Trustee can assert equitable defenses as an assignee of a public entity, this argument fails. Trustee argues that "the County's representations in bond documents, the County Attorney's formal legal opinion of 2007, and the County's representations and appropriations in

18

annual budgets from 2008 to 2018 are inconsistent with the claims asserted for the first time in 2018." Trustee lists these documents but does not identify the language or representations in each one on which it relies. Nonetheless, we have reviewed the documents cited and do not find support for Trustee's argument therein.

In any event, this is a matter of contract interpretation. Where, as here, the contract is unambiguous, "'the intent of the parties is to be discerned from the contract alone' based on the plain and ordinary meaning of the language used." *Whelan Sec. Co*, 379 S.W.3d at 846 (citation omitted). Thus, in light of our analysis concluding the plain language of the Financing Agreement does not contain a promise by the County to pay the shortfall on the Zona Rosa Bonds, this point fails.

Point IV is denied.

***Point V***

In Point V, the Trustee argues that the trial court erred by not directing the County pay the $765,390.95 that it was reserving for the 2018 shortfall because the conditions precedent for the County to pay have been satisfied, in that the County had sufficient revenue and income in 2018 to pay the shortfall on the bonds and the other sources of payment were inadequate.

This point fails in light of our analysis of the plain language of the Financing Agreement and concluding that the trial court was correct in its finding that the County did not promise to pay the shortfall on the Zona Rosa Bonds. Because there was no promise to pay, the trial court did not err in not directing payment to the Trustee of the preserved funds. Moreover, there was no need for the trial court to address the County's obligations for 2018 and 2019 separately as in neither case was the County required to pay for the shortfall. Trustee's argument and authority cited deal

19

with contractual promises to pay which are not persuasive as we have already concluded the Financing Agreement did not contain a contractual promise to pay by the County.

Point V is denied.

*Point VI*

In Point VI, the Trustee argues that the trial court erred by not addressing and not amending its Judgment to address and apply the proper burden for summary judgment because Missouri law provides that the party moving for summary judgment has the burden and the trial court did not acknowledge this burden or the County's failure to meet its burden.

Trustee cites Rule 74.04 which provides for the procedure for motions for summary judgment but does not indicate where in the Rule it requires that a Judgment ruling on a motion for summary judgment must recite that the movant has the burden and whether or not movant met that burden. We do not find such a requirement in Rule 74.04. Trustee does not cite any authority that supports this argument. "When an appellant fails to cite relevant law and explain how it applies to the applicable facts, we deem the point abandoned." *Brown v. Ameristar Casino Kansas City, Inc.*, 211 S.W.3d 145, 148 (Mo. App. W.D. 2007).

Point VI is denied.

## Conclusion

The judgment of the trial court is affirmed.

*/s/ W. Douglas Thomson*_____
W. DOUGLAS THOMSON, JUDGE

All concur.

20